INTERSTATE STOCK-YARDS CO. v. INDIANAPOLIS U. RY. CO. et al.

(Circuit Court, D. Indiana. January 27, 1900.)

No. 9,789.

1. CARRIERS—INTERSTATE COMMERCE ACT—ROADS SUBJECT TO PROVISIONS.

A terminal or belt railroad company, whose line is in and around a city, and entirely within one state, which receives interstate freight for shipment from or delivery to points on its line on through bills of lading issued by other companies on whose lines the shipment begins or ends, submits its road to a common control for continuous shipment, within section 1 of the interstate commerce act, and is subject to the provisions of such act.

2. SAME.

The right of a shipper to invoke the provisions of the interstate commerce law against discrimination on interstate shipments against a railroad company on whose line he is located is not affected by the fact that the duty of such company to receive and handle all freight consigned over its line without discrimination arises from a state statute, rather than from a voluntary arrangement with connecting lines.

**3.** SAME—SUIT FOR DISCRIMINATION—JURISDICTION—PARTIES.

A terminal or belt railroad company, which owns and leases tracks and switches in and around a city, and entirely within one state, and which has entered into a contract with the several roads entering the city, under which its property is entirely managed and operated by a board of managers composed of a member selected by each of such roads, who pay a fixed rental therefor, is a proper, but not a necessary, party to a suit against such roads for violating the interstate commerce act by discriminating against a business establishment located on its lines, and its joinder in such suit does not deprive a federal court of jurisdiction.

**4.** SAME—SWITCH SERVICE—DISCRIMINATION.

Under the interstate commerce act a common carrier of interstate freight cannot lawfully deny switch connections or service to one person, place, locality, or kind of traffic which it affords to others similarly situated; and one who has built a switch connection with the track of a railroad, with the consent of the company, has an implied right to service at such switch, and, unless such service is limited, either expressly or by implication, he may lawfully insist that the carrier shall there receive and deliver all such freight as it customarily carries, and for the receipt and delivery of which the switch is suitable and convenient.

**5.** SAME.

The Union Railroad Transfer & Stock-Yards Company (which afterwards became the Belt Railroad & Stock-Yards Company), which constructed and owns a belt line of railroad in and around the city of Indianapolis, intersecting and connecting with other roads entering the city, was required, by an ordinance, which it accepted, and which was afterwards embodied in a state statute, to extend to all persons doing business on or along its line full facilities to connect switches with its road, and to carry and transport freight to and from such switches at rates per car not exceeding those charged for through freight of like class and character. *Held,* that such ordinance and statute imposed upon the company the duty of affording to all persons constructing such switches equal and impartial service in respect to all freight, and that neither such company nor its lessee could lawfully limit the right to use such switch connections so as to exclude any kind of interstate freight transported over its line, for the purpose of giving to itself or to another a monopoly in the receiving or shipping of such freight.

**6.** SAME—LIVE STOCK—REFUSAL TO DELIVER TO OWNER'S AGENT FOR FEED AND CARE IN TRANSIT.

Neither the national live-stock shipping law, nor that of Indiana, which is identical, requiring stock in shipment to be unloaded, fed, watered, and rested within stated times, justifies an interstate carrier of stock in discriminating between different stock yards at the same place by refusing to deliver such stock at one of the yards, although consigned to it by the owner for care. Such statutes impose the duty of feeding and caring for the stock in the first instance upon the owner, and the carrier has the right to control the same only when the owner or person in charge neglects such duty.

**7.** SAME—SUIT FOR DISCRIMINATION—JURISDICTION OF EQUITY.

The rule that equitable relief will not be granted until the complainant's right or title has been established in an action at law does not apply where the subject-matter of the litigation is alleged discrimination in violation of the interstate commerce act; and where, in such case, the remedy at law is not adequate, equity will take jurisdiction.

On Motion for Preliminary Injunction.

Ferdinand Winter, for complainant.

Baker & Daniels, Morris, Newberger & Curtis, W. A. Ketcham, John B. Cockrum, Miller, Elam & Fesler, John G. Williams, Samuel O. Pickens, and E. C. Field, for defendants.

BAKER, District Judge. This is a suit by the Interstate Stock-Yards Company against the Indianapolis Union Railway Company, the Cleveland, Cincinnati, Chicago & St. Louis Railway Company, the Pittsburg, Cincinnati, Chicago & St. Louis Railway Company, the Cincinnati, Hamilton & Dayton Railway Company, the Cincinnati, Hamilton & Indianapolis Railroad Company, the Lake Erie & Western Railroad Company, the Chicago, Indianapolis & Louisville Railway Company, the Indiana, Decatur & Western Railway Company, the Peoria & Eastern Railway Company, and Volney T. Malott, as receiver of the Terre Haute & Indianapolis Railroad Company, charging each with unlawful discrimination against the complainant in the transportation of interstate commerce by refusing to deliver at its switch live stock in car-load lots consigned to it from other states for delivery at its stock yards in the city of Indianapolis, and to receive for shipment live stock in car-load lots to be transported and delivered to consignees in other states than the state of Indiana. On the filing and presentation of the bill of complaint duly verified, a temporary restraining order was entered, enjoining such alleged discrimination until the further order of the court, and a day was fixed for hearing the complainant's application to enter an order of injunction for the like purpose, to continue in force until the final determination of the suit. This application has been heard on the verified bill of complaint, the verified answers of certain of the defendants, and on numerous affidavits filed by the respective parties. The application, broadly stated, presents only two questions: First. Is the cause of action exhibited in the bill of complaint within the jurisdiction of this court? Second. Under the facts and law of the case, is it shown that the unlawful discrimination complained of exists or is threatened?

The defendants claim that the Indianapolis Union Railway Company, if not an absolutely indispensable party, is at least a necessary party, and, being within the jurisdiction of the court, must be made a party; and because it is a corporation created under the laws of the state of Indiana, and its railroad is located and operated exclusively within the county of Marion, in this state, that it is not engaged in interstate commerce, within the true construction of the interstate commerce act, and is, therefore, subject only to the jurisdiction of the courts of the state for the redress of the grievances complained of. All the parties defendant except the Union Railway Company are confessedly common carriers of interstate commerce, and no question is made but that this court has jurisdiction over them, unless such jurisdiction is ousted because the Union Railway Company is a necessary or indispensable party over which the court has no jurisdiction because it is not engaged in interstate business. If the Indianapolis Union Railway Company is a necessary party, without the presence of which a decree cannot be rendered against the other defendants without prejudice to their substantial rights, then it would be the duty of the court to dissolve the restraining order, to overrule the application for a temporary injunction, and to dismiss the bill. The Indianapolis Union Railway Company is a corporation organized under an act of the general assembly of

the state of Indiana for the incorporation of union railway companies approved March 2, 1885, and as such it has constructed, and now owns in the city of Indianapolis a system of railways, side tracks, and switches connected in or near said city with the above-named railroads, operated, respectively, by said railroad companies and Volney T. Malott, as receiver.   The Belt Railroad & Stock-Yards Company is a consolidated corporation, the constituent members of which are the Belt Railroad & Stock-Yards Company and the Belt Railroad Company of Indianapolis, which were incorporated under the general laws of the state of Indiana for the incorporation of railroad companies, for the special purpose, stated in the articles of incorporation, of providing a convenient method for the transportation and transfer of freight and stock across, through, into, and around the city of Indianapolis, and to effect the speedy and economical exchange of such cars between all the railroads entering or passing through said city, and for the erection and maintenance of ample stock yards for the accommodation of all the live stock that may be brought into or pass through said city.   The Belt Railroad & Stock-Yards Company, whose name, until changed by the decree of the Marion circuit court of the state of Indiana, was the Union Railroad Transfer & Stock-Yards Company, immediately upon its incorporation applied to the common council of the city of Indianapolis for assistance to the extent of $500,000 of the bonds of the city in the construction of the railroad proposed to be constructed by it, namely, a railroad extending around the city, and connecting by means of side tracks and switches with all the railroads which entered the city, and also with the railway of the Indianapolis Union Railway Company, and with the manufacturing and other establishments and places of business in or near the city, whereby through freight trains and cars being transported upon any of the railroads entering the city could be carried around the city, and all freight sent to or by persons, firms, or corporations at their places of business connected by switches with the Belt Railroad could be directly delivered upon or received from said switches; and, to induce the city to give such assistance, said company proposed in writing to the common council of the city, if it would extend such assistance, that it would construct said railroad, together with all necessary and proper switch connections with other railroads crossed by it, and with permission to manufacturers and others to connect with it by switches and side tracks; which said proposition was accepted by an ordinance adopted by the common council of the city, and the bonds of the city to the above-named amount were issued to the Belt Railroad Company, whereby it was enabled to construct its railroad. The fourth section of this ordinance which was accepted by the Belt Railroad Company is as follows:

"Sec. 4. The said Union Railroad Transfer & Stock-Yards Company [whose name was thereafter changed by decree of court to the Belt Railroad & Stock-Yards Company] shall extend to all persons doing business on or along the line of said railroad full facilities to connect switches with the said road, and shall carry and transport freight to and from such switches at rates per car not exceeding that charged by said company for transporting through freight of a like class and character over said road."

By an act of the legislature of this state approved March 2, 1877, the foregoing ordinance was enacted into law, the fourth section of which act is in the identical language of the fourth section of said ordinance. The switch connections now owned and used by the complainant were connected with the Belt Railroad in or about the year 1880 under and pursuant to the foregoing ordinance and statute. The act of March 2, 1885, under which the Indianapolis Union Railway Company is incorporated, and which authorized it to lease and operate the Belt Railroad, provided as follows:

"Sec. 11. Any such union railway company may by agreement in writing with any railroad company, not being one of said proprietary companies and owning or operating a railroad which extends to, into or through, or near the town or city in or near which such union railroad is or may be situated, admit said last mentioned railroad company to the use of the tracks, side tracks, switches, depots, depot grounds, yards, sheds and other structures or railroad facilities and appliances (including the use of its belt railroad and belt railroad facilities, if any) during such time, on such terms and conditions, and for such compensation or rent as may be agreed upon. The right of any associate company to continue in the use and enjoyment of the property and facilities of the union company may be made to depend upon the faithful performance of such terms and conditions by such associate company as may be inserted in said agreement. The companies which may be so admitted are herein designated as associate companies: provided, that no such associate company shall be admitted to the use of the property and facilities of such union railway company except upon the unanimous vote of the directors of such union company."

The thirteenth and fourteenth sections of the act provide that, in case other railroad companies are admitted to the use of the railroad and other property of the Union Railway Company, a board of managers shall be appointed, composed of one representative selected by each railroad having such use, to whom it shall be competent to delegate so much of the authority, power, and jurisdiction of the board of directors as may be agreed upon. The seventeenth section provides that any agreement entered into before the taking effect of the act for the use of such property by other railroad companies shall have the same force and effect, and be as valid and binding, as if it had been made after the taking effect of the act. By the last preceding section the so-called "reorganization agreement" of October 17, 1882, was ratified and confirmed. The fifth and sixth clauses of this agreement provide for an appraisement of the value of all the property, including the lease of the Belt Railroad, owned by the Union Railway Company; also of all engines, cars, and other equipment, tools, or machinery used in operating and maintaining the Belt Railroad; and that such appraisement shall for all time to come constitute the basis on which the fixed rental shall be computed and paid as hereinbefore provided. The seventh clause provides that interest at the rate of 7 per centum per annum shall be paid upon the appraised value of all such property, and the amount thereof shall constitute the fixed rental to be paid to the Union Railway Company by the several other railroad companies making use of the same, and said fixed rental shall be from time to time divided into as many equal shares as there are railroad companies using said property, and each company so using the same shall pay one of said shares. The

eighth clause provides that the tracks of the Union Railway Company shall be used exclusively, as far as possible, for passenger train service and such local freight deliveries as may be necessary in consequence of the location of freight houses and private sidings. All other freight transfers and deliveries shall be made over the Belt Railroad. And it further provides that all expenses growing out of the maintenance, operation, renewal, and replacement of the Belt and Union Railroads, including taxes, assessments, insurance, wages and salaries, and moneys paid for damages to person or property shall be paid by the several companies having the joint use of the property in proportion to such use on the wheelage basis. In the ninth clause the property is spoken of as the joint property of the companies using the same. The tenth clause imposes upon the companies the obligation to pay the cost of rebuilding or replacing the property in case of a partial or total destruction by fire or other cause. In the eleventh clause each company is made responsible for loss or damage to person or property, except to property used in common, which arises out of the conduct or neglect of its own employés; claims for loss or damage to person or property, including property used in common, arising out of the conduct or neglect of employés paid in common, shall be paid by the Union Railway Company, and all moneys so paid by it are to be charged to the current account of expenses of operating and maintaining the belt railroad and union railway property, as the case may be, and paid by the companies using the property on the wheelage basis, as provided in clause 8. The twelfth clause provides that the current operation, maintenance, renewal, and repair of said Belt Railroad and said Union Railway Company property shall be conducted by a board of managers, to be composed of one representative from each company using said Union Railway Company property, and under such rules, and by such officers and employés as said board shall prescribe; and it further provides that the board of managers is hereby vested with authority to make rules governing all joint employés, and to prescribe the terms and conditions upon which such Belt Railroad and said Union Railway Company property may be used in common; also to appoint all officers, agents, and employés who may be necessary to conduct the joint business. They shall also fix the time of the arrival and departure and regulate the movement of all trains upon said Union Railway property and said Belt Railroad. Each company shall receive equal and impartial privileges in the use of said joint property. All financial transactions incident to the maintenance, operation, renewal, and replacement of said property shall be conducted wholly through the officers and agents of the Union Railway Company. The fourteenth clause provides that the grant of right of joint use of said Belt Railroad and said Union Railway property, subject to the conditions above stated, is hereby made perpetual to the companies accepting the same and executing a certified copy of this agreement; and it further provides that each of said companies binds and obligates itself, its successors and assigns, to forever continue the joint use aforesaid, and subject to and upon the terms and conditions herein stated.

The Belt Railroad & Stock-Yards Company was incorporated for the purpose of providing a convenient method for the transportation and transfer of freight and stock cars through, into, and around the city of Indianapolis, and to effect the speedy and economical exchange of such cars between all railroads entering into or passing through the city. The ordinance of the city, which it accepted, required it to construct a railroad with all necessary and proper switch connections with all other railroads crossed by it, and expressly required it to extend to all persons doing business on or along the line of its railroad full facilities to connect switches with its railroad, and to carry and transport all freight to and from such switches at rates per car, not exceeding that charged by it for transporting through freight of the like class and character. The act of March 2, 1877, in express terms imposed the same duties upon it. If the Belt Railroad Company had made with each of the other defendants an arrangement to receive from them cars containing freight transported from other states, and to deliver the same to the consignee upon the consignee's switch or side track connected with its railroad, could it be doubted that in handling such freight it would have been engaged in interstate transportation? Such an arrangement would have made the Belt Railroad a common carrier for a continuous shipment of interstate freight within the terms of the interstate commerce act. But it is contended by the defendants, because the jurisdiction of this court is limited to the enforcement of right growing out of national legislation in the absence of diverse citizenship, that the articles of incorporation, the ordinance, and the ratifying statute are irrelevant, and should be disregarded. The complainant does not resort to the jurisdiction of this court to enforce its right to switch service generally, for that, for want of diversity of citizenship, would not be within its jurisdiction. It simply complains of discrimination as to switch service in respect to interstate freight, and of the refusal to transport and deliver such freight in accordance with the terms of through bills of lading. It seeks to have the Belt Railroad and its lessee, the Union Railway Company, as a carrier engaged in the transportation of interstate freight received from connecting interstate railroads, which it has voluntarily received for shipment and delivery, compelled to carry and deliver the same in accordance with the bills of lading under which such freight was received. Its right to this relief grows out of national legislation. But why is the complainant not entitled to show that its right to such switch service for interstate freight consigned to or received by it does not rest solely upon the ground that such service is voluntarily afforded to others and denied to it? Is it any the less a discrimination, within the prohibition of the interstate commerce act, that the party complaining has a legal right created by ordinance and statute to the service which is denied, than if the right to such service grew out of mutual arrangement between connecting interstate carriers? The duty in the one case grows out of contract, and in the other is created by law. But in each case the obligation to perform the duty is equally binding. Neither grows out of federal legislation, but either may be looked

to in determining whether there has been a discrimination in the performance of that duty within the prohibition of the interstate commerce act. The thing forbidden by the federal statute is discrimination by a carrier engaged in whole or in part in the transportation of interstate freight, and whether the existence of such discrimination depends on the duty of the carrier created by statute or on a duty growing out of contract, express or to be inferred from a common course of business, would seem to be quite immaterial. The jurisdiction of this court does not depend upon the ultimate determination of the case, but on the question whether it is made to appear by the averments of the bill of complaint that the Union Railway Company has discriminated, within the true intent of the interstate commerce act, in failing to perform a legal duty owing to the complainant by refusing to deliver or to receive interstate freight, consigned to or by it on through bills of lading on its switch connected with the Belt Railroad. It seems to me that the complaint shows the existence of a duty imposed upon the Union Railway Company to deliver and receive interstate freight consigned to or by the complainant on its switch connected with the Belt Railroad. The agreement referred to in the complaint, and hereinbefore set out, leads to the same conclusion. The effect of this agreement is that the Union Railway Company, as a corporate entity, and as the lessee and owner of the Belt and Union railways, locomotives, cars, and other property pertaining thereto, leases the same in perpetuity to the defendant railway companies other than itself, and as compensation for such lease receives a fixed rental computed upon the value of the property which is to be paid by the leasing companies to it for its own exclusive use as a distinct corporation. It has nothing to do as a corporation with the use that is to be made of the leasehold property. Its board of directors has no control over such use. The railroads and other leasehold property are placed under the exclusive control and management of a board of managers, which is a body distinct and separate from the Union Railway Company or its board of directors. This board of managers does not, in any respect, represent or act for the Union Railway Company as a corporation, but acts solely as the representative of the other railway companies which are engaged in using and operating the Belt and Union Railroads for their own several purposes in performing their duties as interstate common carriers of freight and passengers. Every agent and employé who has anything to do in the maintenance and operation of the Belt and Union Railroads is employed by this board of managers. The entire expense of their maintenance and operation is paid by the railroads having their use in proportion to the use by each severally on the wheelage basis. If there is loss or damage to person or property, caused generally by the companies having such use, it is, in the first instance, paid by the Union Railway Company; but it is treated as an expense of the operation, and is charged to and repaid by the operating companies on the wheelage basis. The officers of the Union Railway Company have nothing to do except to keep the account of the operating expenses, and apportion them to the operating

companies, and collect from each its proportionate share of such operating expenses, and disburse the moneys so received in payment of salaries, wages, taxes, and other expenses. In all this they act simply as agents and employés of the operating companies. Their salaries are included in the expenses, which, under the eighth clause are paid by the operating companies on the wheelage basis. The switching charge of one dollar per car which is collected from each railroad company for the transportation of its cars over the Belt and Union Railroads is not paid to or received by the Union Railway Company for its own benefit, as is the fixed rental which is paid for the use of the property, but is collected for the joint benefit of the operating companies exclusively; and the aggregate amount of such charges is credited in each month upon the operating expenses for that month, and the balance is then apportioned to the operating companies severally on the wheelage basis. From the foregoing review of the facts it seems perfectly clear that under the third clause of the first section of the interstate commerce act the Belt Railroad leased to the Union Railway Company is to be regarded as a part of the railroad system of each of the other defendant railway companies, except the Union Railway Company, so that, for the purposes of interstate freight traffic, the complainant's stock yards and switch connections are to be treated as being connected with each of said railroads. And, if there is any discrimination by either of them, or any other violation of duty in respect to the delivery or receipt of interstate freight to or from the complainant by the defendant railroad companies, other than the Union Railway Company, it is entitled to invoke the jurisdiction of this court for the relief sought by the bill of complaint. If the Union Railway Company is to be regarded as operating a belt railroad as a common carrier, then, as it received shipments of interstate freight consigned to or from the complainant on through bills of lading issued by the defendant railroad companies upon whose line the shipment begins or ends, it is to be treated as having subjected the Belt Railroad to a common control for a continuous shipment within the first clause of section 1 of the interstate commerce act. Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935. If, on the other hand, the Union Railway Company is to be regarded as operating the Belt Railroad in its corporate capacity as a switching road for the other defendant railway companies, for a switching charge to be paid to it for its own use and benefit, then it is properly joined as a necessary party defendant. But, if the Belt Railroad is being controlled and operated by the other defendant railroad companies, as joint sublessees of the Union Railway Company, then the latter company, while a proper, is not a necessary, party. But in either case, if the discrimination charged as to the shipment of interstate freight is shown, the court would be authorized to entertain jurisdiction; for, if it be conceded that the Union Railway Company is not engaged in carrying interstate freight over the Belt Railroad, and hence is simply a proper, but not a necessary, party, the only result would be that the court would dismiss the suit as to it, and would retain

jurisdiction as to the other parties defendant. The court, however, while of opinion that the Union Railway Company is not a necessary party, is still of the opinion that it is so implicated by the averments of the bill and the proofs in the alleged discrimination charged against all of the defendants that it is proper to retain jurisdiction over it as a party defendant. For these reasons the court must decline to dismiss the bill for want of jurisdiction.

The remaining question is whether, under the facts and the law, it is shown that the unlawful discrimination complained of is threatened or exists. It is clear, by force of the express terms of the interstate commerce act, that in respect of interstate commerce there can be no lawful discrimination to the advantage or disadvantage of any person, place, locality, or kind of traffic. A common carrier of interstate freight cannot lawfully deny switch connections and service to one person, place, locality, or kind of traffic which it affords to others similarly situated. The complainant is the owner of switch connections with the Belt Railroad, which have been in existence for a long period of time. Such switch connections were made with the consent of the Belt Railroad, and under the authority of the fourth section of the ordinance and statute above mentioned. The contention of counsel for the defendants is that these switch connections were made simply for the purpose of delivering and receiving dead freight thereat and therefrom. The existence of switch connections rightfully existing implies the right of the owner thereof to service thereat by the carrier consenting to such connections. It would be a vain and foolish thing to incur the labor and expense of making such connections unless they were to be used in connection with the transportation of freight to and from the same. And, unless the right to service at such switch connections is limited, either expressly or impliedly, the owner thereof may lawfully insist that the carrier shall there deliver and receive all such freight as it customarily carries, if the switch connections are suitable and convenient for the delivery and receipt of such freight. There is no evidence of any limitation of the purposes for which the switch connections now owned and used by the complainant should be used, other than that which is to be implied from the fact that such connections were constructed for the delivery and receipt of dead freight. In the opinion of the court, the Belt Railroad could not lawfully limit the right to use such switch connections for any kind of interstate freight transported by it. Any such limitation would be prohibited by the true construction of the fourth section of the ordinance and statute. The ordinance and statute under which they were put in cannot be construed as limiting the right to use the switch connections of the complainant solely for the receipt and delivery of dead freight. There is nothing in the ordinance or statute justifying such a construction. The language of the fourth section of each is clear and unambiguous. Each requires switch connections to be granted to all persons, and service in respect of all freight to be afforded upon equal rights and impartial terms. It is to be assumed that the switch connections were put in upon the implied understanding

99 F.—31

that the owners of such connections should, so long as they existed, have the right to service thereon for all sorts of freight and upon impartial terms. It would do violence to the language employed to construe it as counsel for the defendants contend that it should be construed. They construe it as though it read to afford full facilities to connect switches with the Belt Railroad for the delivery of all freight other than live stock, and to carry and transport such dead freight to and from such switches. There is not a word in the ordinance or in the statute, nor anything in the situation of the parties, to show that either the city or the state had any purpose to establish or encourage the stock-yards business of the Belt Railroad, or to confine the location of the stock-yards business to any particular locality, or to limit the number of stock yards in or about the city. If it had been the intention of the city or state to secure to the Belt Railroad & Stock-Yards Company a monopoly of the stock-yards business for all time to come, it would have been easy to have so provided in plain and unambiguous terms. Nothing short of the clearest and most unambiguous language would justify the court in holding that it was the purpose of either the state or city to create a perpetual monopoly. It may well be doubted whether a statutory enactment for that purpose would not be declared void, as in conflict with the constitution, which provides that the general assembly shall not grant to any citizen or class of citizens privileges or immunities which, on the same terms, shall not equally belong to all citizens. The business of operating and maintaining a stock yards for private gain is separate and distinct from that of operating and maintaining a railroad. The business reserved to itself by the Belt Railroad & Stock-Yards Company in its lease of its railroad and railroad property to the Indianapolis Union Railway Company is that of maintaining and operating a stock yards for private gain. In the lease to the Union Railway Company the latter agrees to assist and encourage the stock-yards business of the lessor company so far as it may lawfully do so. This stipulation does not authorize the Union Railway Company to assist the Belt Railroad & Stock-Yards Company in its private business as a stock-yards company in creating and perpetuating a monopoly. It is not to be supposed, whatever may be the private views of the judge as to monopolies and trusts, that any self-respecting court could anywhere be found that would sanction by its decree the creation or maintenance of a monopoly or trust, unless constrained so to do by some imperative requirement of law. It is firmly settled that a railway company cannot discriminate, even in favor of itself, in respect of business which is not railroad business proper. Railway Co. v. Dohn (Ind. Sup.) 53 N. E. 937; Parkinson v. Railway Co., L. R. 6 C. P. 554, 1 Nev. & McN. 280; Ilwaco Ry. & Nav. Co. v. Oregon S. L. & U. N. R. Co., 6 C. C. A. 495, 57 Fed. 673. By a stronger reason it will not be permitted to discriminate in favor of the business of another, even where, for a consideration moving to it in respect to its railroad business, it has contracted to protect and encourage such other business.

It is contended by counsel for the defendants that the national and state statutes requiring railroad companies to feed, water, and

rest live stock in transit give to such companies the right to select the agencies and places for the performance of these duties. This may be conceded, as a general proposition, without affecting the complainant's right to relief. The act of congress provides that no railroad company shall confine live stock in cars for a longer period than 28 consecutive hours without unloading the same for rest, water, and feeding for a period of at least 5 consecutive hours, and that, when so unloaded, the animals shall be properly fed and watered during such rest by the owner or person having the custody thereof, or, in case of their default, then by the railroad company, at the expense of the owner or person in custody thereof. The statute of this state is a copy of the federal statute. The complainant does not ask that the defendant railway companies shall be required to do anything in violation of these statutes. It simply asks that live stock consigned to it, or to persons doing business in its yards, or contracted in the bill of lading to be unloaded, fed, watered, and rested there, shall be delivered in accordance with the contract. As the statute makes it primarily the duty of the owner or person having the custody of the animals properly to feed and water them, the complainant's stock yards would be regarded as the agent pro hac vice of the consignors or consignees under the bills of lading which designated its stock yards as the place of delivery. If the complainant does not properly discharge its duty, then, and only then, would the duty be devolved upon the carrier. In that case the company could employ the Belt Railroad & Stock-Yards Company or any other person to properly care for the animals, and, as the statutes provide, the carrier would have the right to charge the expense to the owner or person having charge of the animals, and would have a lien upon them for its security, and it would not be liable for any detention of the animals occasioned by having to care for them elsewhere; nor would the railroad company be bound to resume the transportation of such animals until the expiration of the five consecutive hours of rest. These considerations would seem to be a sufficient answer to this contention of counsel for defendants.

The nature of the wrong complained of, the fact that it is of a continuing character, that it is not susceptible of accurate pecuniary estimation, and that resort to actions at law would involve a multiplicity of suits, none of which would end the litigation, all tend to make it manifest that the remedy in a court of law is not as adequate to afford relief as is the remedy in a court of equity. The jurisdiction in equity does not depend upon the fact that there is no remedy at law. It is afforded whenever the remedy at law is not as full, adequate, and complete as in a court of equity. The rule that equitable relief will not be granted until the complainant's right or title in respect of the subject-matter has been established in an action at law, does not apply where the subject-matter of the litigation is to prevent discrimination in violation of the interstate commerce act.

A review of the evidence in this case would prove unprofitable, and would needlessly protract this opinion. It suffices to say that,

in the opinion of the court, the discrimination complained of is made out by the proofs. An injunction pendente lite will be awarded.