UNITED STATES ex rel. GREENBRIER COAL & COKE CO. v. NORFOLK
& WESTERN RY. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1906.)

No. 623.

CARRIERS—MANDAMUS—ENFORCEMENT OF COMPLIANCE WITH INTERSTATE COM-
MERCE ACT—EFFECT OF AGREEMENT.

An arrangement between an interstate railroad company and coal
shippers in a certain field, fixing a basis which should be considered
equitable for the distribution of cars between such shippers, does not
operate to relieve the railroad company from the obligations imposed
on it by section 3 of that interstate commerce act of February 4, 1887
(24 Stat. 380, c. 104 [U. S. Comp. St. 1901, p. 3155]), to treat shippers
without discrimination, nor does it deprive one of such shippers of the
right to maintain a proceeding in a federal court for a writ of man-
damus under the amendatory act of March 2, 1889 (25 Stat. 862, c. 382,
§ 10 [U. S. Comp. St. 1901, p. 3172]), to compel the company to furnish
to relator its equitable proportion of cars, upon allegations that the
basis of distribution fixed by the agreement was equitable and that de-
fendant has refused to observe it, but has discriminated in favor of
other shippers; the agreement being in fact in aid of the act by fixing
as between the parties what should be considered and accepted as a
compliance with its requirements.

[Ed. Note.—For cases in point, see vol. 9, Cent. Dig. Carriers, § 120;
vol. 33, Cent. Dig. Mandamus, § 268.]

In Error to the Circuit Court of the United States for the Southern
District of West Virginia.

For opinion below, see 138 Fed. 849.

Geo. E. Price, C. W. Dillon and Wm. A. Glasgow, for plaintiff in
error.

John H. Holt and Z. T. Vinson (Brown, Jackson & Knight, Holt
& Duncan, Vinson & Thompson, Jos. I. Doran, and D. E. Johnston,
on the brief), for defendants in error.

Before PRITCHARD, Circuit Judge, and WADDILL, District
Judge.

PRITCHARD, Circuit Judge.   This is a petition for mandamus
to the Circuit Court of the United States for the Southern District
of West Virginia, under the provisions of the act of Congress of
March 2, 1889, alleging a violation of "An act to regulate commerce,"
approved February 4, 1887, and acts supplementary thereto. Upon
this petition an alternative writ of mandamus was awarded, and on
the 6th day of June, 1905, the parties defendant appeared and a
motion was made by the railway company and certain other defend-
ants to quash the alternative writ of mandamus and each paragraph
thereof, which motion the court sustained.   The allegations upon
which the writ is asked are that the Norfolk & Western Railway
Company is a common carrier, and is subject to the provisions of
"An act to regulate commerce," and the several acts amendatory
and supplemental thereto, and said railway company is engaged in
carrying coal and coke for the plaintiff company and other coal com-
panies in the state of West Virginia in various markets in other

states; that the Norfolk & Western Railway Company agreed that the car supply furnished by it to the several shippers of coal along its line would be distributed pro rata to such shippers; that the railway company agreed that the coke ovens owned and operated by the respective coal shippers along the line of the said railway should form the basis of coal car distribution, and that the car supply furnished by the said railway company between the respective coal shippers mentioned would be distributed to each shipper in the same proportion as the number of ovens owned and operated by such shipper bore to the whole number of ovens owned and operated by all the shippers of coal from such field; that said coke ovens basis of distribution was and is equitable and fair; that the railway company agreed, with the plaintiffs in error and all the other coal companies mentioned as defendants, that the car supply would be furnished upon the coke ovens basis aforesaid; that the railroad company had declined to furnish the plaintiff in error with the number of cars to which it was entitled under this basis of distribution; that the railway company has departed from such basis of distribution and has furnished to coal companies, other than the plaintiff in error, more than their fair number of cars, and the railway company thereby discriminated against the plaintiff in error, and did not carry out the fair and equitable basis of distribution above set forth. Upon the hearing the Circuit Court held that, inasmuch as all the parties interested in the distribution of cars had agreed upon a method of distribution according to an arbitrary basis, it could not enforce such an agreement by mandamus under the act of March 2, 1889.

The main question presented for consideration is whether the court erred in sustaining the motion to quash the alternative writ of mandamus. Section 3 of the interstate commerce act, approved February 4, 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), in pursuance of which the petition was filed herein, is as follows:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever," etc.

This section, while comprehensive in its scope, did not afford effective means by which the provision of the act could be carried into effect, and as a result Congress passed a supplemental act on the 2d of March, 1889 (25 Stat. 862, c. 382 [U. S. Comp. St. 1901, p. 3172]), section 10, of which is as follows:

"That the Circuit and District Courts of the United States shall have jurisdiction upon the relation of any person or persons, firm or corporation, alleging such violation by a common carrier, of any of the provisions of the act to which this is a supplement and all acts amendatory thereof, as prevents the relator from having interstate traffic moved by said common carrier at the same rates as are charged, or upon terms or conditions as favorable as those given by said common carrier for like traffic under similar conditions to any other shipper, to issue a writ or writs of mandamus against

said common carrier, commanding such common carrier to move and transport the traffic or to furnish cars or other facilities for transportation for the party applying for the writ: provided, that if any question of fact as to the proper compensation to the common carrier for the service to be enforced by the writ is raised by the pleadings, the writ of peremptory mandamus may issue, notwithstanding such question of fact is undetermined, upon such terms as to security, payment of money into the court, or otherwise, as the court may think proper, pending the determination of the question of fact: provided, that the remedy hereby given by writ of mandamus shall be cumulative, and shall not be held to exclude or interfere with other remedies provided by this act or the act to which it is a supplement."

The purpose of this act is to place "all shippers on an absolute equality." The sections in question were intended to prevent discrimination in all branches of freight traffic. The language employed therein is plain, and leaves no doubt as to the true intent and meaning of Congress in the enactment of this legislation. There is nothing in the interstate commerce act, nor in the acts supplemental thereto, which undertakes to describe any particular method of service by common carriers, either in equipment and allotment of cars or the manner of movement of traffic. It leaves the carrier free to make such an arrangement with its shippers as it may deem proper, but the basis of distribution must be such as to put "all shippers on an absolute equality" and to transport traffic for each shipper "upon terms and conditions as favorable as those given by said common carrier for like traffic under similar conditions to any other shipper," provided that it does not give "undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic in any respect whatsoever, or subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable preference or disadvantage in any respect whatsoever."

It is insisted by the defendants in error that the allegations contained in the petition for the writ of mandamus do not bring this case within the purview of the statute; that the operators in the Pocahontas coal fields, by entering into an agreement with the common carrier as to the basis upon which the distribution of cars is to be made, have placed themselves in a position where the United States Court is powerless to interfere by mandamus as provided in section 23 of the act of March 2, 1889, to prevent the discrimination forbidden in section 3 of the interstate commerce act. In other words, it is insisted that the agreement between the shipper and the common carrier to adopt the coke ovens basis as the means by which to secure a proper distribution of cars among the shippers is in the nature of a contract, and that the United States court has no power to compel the execution of a contract by mandamus. This would undoubtedly be true if the plaintiff in error relied upon a contract as the basis of its cause of action, but in this case the agreement entered into between the shippers and the carrier is not a contract in the ordinary acceptation of the term. A mere arrangement between the railroad company and its patrons, relating solely to the basis upon which an equitable and fair distribution of cars could be secured, does

not operate to relieve the carrier from the obligations imposed by section 3, nor does the shipper lose the rights or remedies of section 23 of the act of March 2, 1889, supplemental thereto.

The agreement in question is clearly in aid of the interstate commerce act, and, at most, is but an expression of opinion by the carrier on the one hand and the shipper on the other as to what they deem a proper basis for an equitable distribution of cars among shippers. Some such arrangement was necessary in order to enable the carrier to properly understand what would constitute a compliance with the statute on its part, and at the same time to enable the shipper to ascertain and enforce his rights in accordance with section 3, in the event he should be of opinion that the acts of the carrier were such as to amount to a discrimination against him as contemplated by the statute. It merely indicates a disposition on the part of the shipper to accept his proportionate share of the cars to be allotted by a particular method of distribution as being a substantial compliance with the statute by the carrier. To hold otherwise would be to decide that the carrier by entering into an agreement with the shipper as to the basis or means by which the distribution of cars is to be made could thus by indirection nullify the plain provisions of the statute. The only defense which the shipper could interpose as a reason for not complying with the act would be to show that such basis was not a reasonable or just one, and that is a matter which cannot be considered in the present state of the pleading, and one which the court would not have been justified in considering in passing upon a motion to quash. The case of Interstate Stockyards Co. v. Indianapolis Union R. R. Co. (C. C.) 99 Fed. 472, bears directly on this point. In that case the Belt Line Railroad Company and the stockyards applied to the City of Indianapolis for assistance in the construction of a belt line around the city, and, among other things, it agreed as follows:

"That it would construct said railroad, together with all necessary and proper switch connections with other railroads crossed by it, and with permission to manufacturers and others to connect with it by switches and side tracks."

In pursuance of this agreement $500,000 of the bonds of the city were given to the Belt Line Railroad Company, with the understanding that it should extend to all persons doing business on or along the line of the said railroad full facilities to connect switches with the said road, and carry and transport freight to and from such switches at rates per car not exceeding that charged by said company for transporting through freight of a like class and character over said road. Although the Interstate Stockyards Company was the owner of one of the switches connected with the Belt Line Railroad, such road refused to transport freight for it as others similarly situated. Suit was brought in the Circuit Court of the United States to compel the transportation of freight for the Interstate Stockyards Company on the ground that the refusal of the Belt Line Railroad Company to transport such freight was discrimination forbidden by the interstate commerce act. The Belt Line Railroad

Company contended that the jurisdiction of the court was limited to the enforcement of rates growing out of national legislation, and in the absence of diverse citizenship that the articles of incorporation and the ordinance conferring such were irrelevant, and should be disregarded upon the theory that, if a contract was executed, that the court could not assume jurisdiction under the interstate commerce act to enforce such a contract.

In this case Judge Baker, who delivered the opinion of the court, among other things, said:

"But why is the complainant not entitled to show that its right to such switch service for interstate freight consigned to or received by it does not rest solely upon the ground that such service is voluntarily afforded to others and denied to it? Is it any the less a discrimination, within the prohibition of the interstate commerce act, that the party complaining has a legal right created by ordinance and statute to the service which is denied, than if the right to such service grew out of mutual arrangement between connecting interstate carriers? The duty in the one case grows out of contract, and in the other is created by law. But in each case the obligation to perform the duty is equally binding. Neither grows out of federal legislation, but either may be looked to in determining whether there has been a discrimination in the performance of that duty within the prohibition of the interstate commerce act. The thing forbidden by the federal statute is discrimination by a carrier engaged, in whole or in part, in the transportation of interstate freight and whether the existence of such discriminations depends on the duty of the carrier created by statute or on a duty growing out of contract, express or to be inferred from a common course of business, would seem to be quite immaterial. The jurisdiction of this court does not depend upon the ultimate determination of the case, but on the question whether it is made to appear by the averments of the bill of complaint that the Union Railway Company has discriminated, within the true intent of the interstate commerce act, in failing to perform a legal duty owing to the complainant by refusing to deliver or to receive interstate freight, consigned to or by it on through bills of lading on its switch connected with the Belt Railroad. It seems to me that the complaint shows the existence of a duty imposed upon the Union Railway Company to deliver and receive interstate freight consigned to or by the complainant on its switch connected with the Belt Railroad. The agreement referred to in the complaint, and hereinbefore set out, leads to the same conclusion."

It matters not how petitioner's right to an equal distribution of cars may have arisen, whether by contract, statute, or common law. The plaintiff in error avers that it has such legal right, and that the defendant in error is discriminating against complainant. The interstate commerce act clearly forbids the discrimination described in the bill, and we are therefore of the opinion that the court has the power under the interstate commerce act and the act of March 2, 1889, supplemental thereto, to prohibit such discrimination. A careful consideration of the statutes bearing on this subject leads us to the conclusion that to adopt any other construction would be to render the interstate commerce act, in so far as it relates to discrimination, of no force, and to defeat the obvious purpose for which it was enacted.

The court below erred in allowing the motion to quash the alternative writ of mandamus. We are also of the opinion that the court erred in not allowing the amendment which was offered by the plain-

tiff in error to the petition and the alternative writ of mandamus. The amendment should have been allowed.

The judgment of the Circuit Court is therefore reversed, with instructions to proceed in accordance with the views herein expressed.

Reversed.