## UNITED STATES ex rel. KINGWOOD COAL CO. v. WEST VIRGINIA NORTHERN R. CO. et al.

(Circuit Court, N. D. West Virginia.   October 15, 1903.)

**1. INTERSTATE COMMERCE—DISTRIBUTION OF COAL CARS TO MINES BY RAILROAD COMPANY.**

Under the provisions of section 3 of the interstate commerce law it is the legal duty of a railroad company, in furnishing cars to coal mines along its line, where a limited number only can be supplied, to distribute the same impartially, without unjust discrimination or favoritism; and such distribution should be based on a disinterested and intelligent examination by experts of the different mines, and upon a consideration

of all the factors which go to make up their capacity, both actual and potential, the most important being the number of workings and their capacity for production, the equipment in use for handling and loading the product being secondary, because it may be readily and quickly increased if necessary to meet the requirements.

**2. SAME—UNJUST DISCRIMINATION.**
    Evidence considered, and *held* to show that the distribution of cars by a railroad company between coal mining companies on its line of road was made upon a basis which gave an undue preference to certain companies, and operated to the undue prejudice and disadvantage of the relator company, in violation of section 3 of the interstate commerce law.

Suit on Relation for Violation of Interstate Commerce Law.

J. W. Davis, V. G. Robinson, and J. J. Davis, for relator.
C. G. Sprout, P. J. Cragan, and John H. Halt, for respondents.

GOFF, Circuit Judge.   This proceeding was instituted under the provisions of the act of Congress of February 4, 1887 (24 Stat. 379, c. 104), amended March 2, 1889 (25 Stat. 855, c. 382), and February 8, 1895 (28 Stat. 643, c. 61 [U. S. Comp. St. 1901, p. 3154]).   On the petition of the Kingwood Coal Company, duly verified, the alternative writ was issued on the 1st day of May, 1903.   The answer of respondents was regularly tendered and filed, issues joined, testimony heard, and the case argued and submitted.   By agreement of all the parties a jury was waived, and the questions raised by the pleadings were submitted for the finding and judgment of this court. Many witnesses were examined, documentary testimony offered, and counsel has been fully heard.   The court has carefully considered, and at least endeavored to digest, the evidence, and to properly apply it to the law applicable to the facts found.

The relator is a corporation engaged in the mining and shipping of coal in Preston county, W. Va., on the line of the West Virginia Northern Railroad company, one of the respondents.   The Irona Coal Company and the Atlantic Coal & Coke Company, also respondents, are likewise engaged in mining and shipping coal, their mines being located on the line of their co-respondent, the West Virginia Northern Railroad Company, the three mines mentioned being the only collieries so located and operated.   It is charged in the petition filed by the relator that the respondent railroad company, in the transportation of the coal mined at said mines, and entering into and becoming part of the interstate commerce of the country, has been, and was when the petition was filed, discriminating in favor of the Atlantic Coal & Coke Company and the Irona Coal Company, and against the Kingwood Coal Company.   It appears that the West Virginia Northern Railroad Company is not the owner of any of the cars used on its line for the transportation of coal, but that all such cars are furnished by the Baltimore & Ohio Railroad Company, over the tracks of which such coal ultimately reaches its markets.   After such cars are delivered to the West Virginia Northern Railroad Company, they are distributed among the mines along its line under the superintendence of its general manager.   Under the pleadings the matter to be determined by the judgment of this court is, did the West Virginia Northern Railroad Company, in distributing the cars so re-

ceived by it from the Baltimore & Ohio Railroad Company, make a just allotment of them among the three mines mentioned, or did it so assign them as to unlawfully discriminate in favor of two of them as against the other one?

It was and is the duty of the West Virginia Northern Railroad Company to so manage its business with all three of the coal mines located on and shipping coal over its line in the same relative and impartial way, so as to show no favoritism to either one of them; thereby exercising the power and discretion confided to it, so as not to act in a manner the result of which would necessarily build up one at the expense of the others, or advance the interest of two to the detriment of the third. It is quite evident that railroad companies can, by the improper distribution of cars among competing coal companies, build up some of them and make them prosper, while at the same time it tears down and eventually destroys others. Hence the wise provision of the law that no favoritism shall be shown, and that no unjust discrimination will be permitted. The relator insists that on May 1, 1903, it was discriminated against by the West Virginia Northern Railroad Company—that it should then have received at least $33\frac{1}{3}$ per cent. of the tonnage of the cars furnished to said company by the Baltimore & Ohio Railroad Company, when in fact it received much less than that allotment, the other two mentioned mines receiving at the same time much more than their just and equitable share. We are now to deal with conditions as they existed on and subsequent to that date, considering previous incidents only as they may tend to elucidate matters as they, in fact, were when the petition was filed.

It is quite clear that the output of a coal mine is largely controlled by the number of railroad cars available for use in sending its coal to market. Prudent and economical management requires that no more coal be mined at any time than can be promptly sent to market, and hence it follows that the absence of a sufficient number of railroad cars in which to transport its output removes the incentive that otherwise would exist to increase the production of a mine. I find that at the time this suit was instituted the cars distributed by the West Virginia Northern Railroad Company were apportioned on a basis virtually as follows, viz., to the Kingwood Coal Company, 17 per cent.; to the Atlantic Coal & Coke Company, 27 per cent.; and to the Irona Coal Company, 56 per cent. This allotment was founded on a rating of the capacity for output per day of the mines as follows, viz., 400 tons to the Kingwood Coal Company, 600 tons to the Atlantic Coal & Coke Company, and 1,250 tons to the Irona Coal Company. Was this method of distribution a proper one? Did it produce that just and equitable result contemplated by the statute applicable thereto? Was it free from unfair discrimination and was it at least approximately correct? The agreed method of car distribution that had existed down to and for a time subsequent to the first shipment of coal from the mines of the Atlantic Coal & Coke Company— the mine last opened for business—was no longer in force when, at the instance of the relator, this proceeding was commenced, but at that time the officials of the West Virginia Northern Railroad Company, for reasons of their own, arbitrarily determined the method of

distribution, and made the allotments thereunder, and it is such action on the part of that company that this court, in deciding the issues herein joined, is required to pass upon.

I am of the opinion that in reaching a proper basis for the distribution of railroad cars it is necessary that an impartial and intelligent study of the capacity of the different mines be made by competent and disinterested experts, whose duty it should be to carefully examine into the different elements that are essentially factors in the finding of the daily output of the respective mines which are to share in the allotment. Among the matters to be investigated are the following: The working places, the number of mine cars and their capacity, the switch and tipple efficiency, the number and character of the mining machines in use, the hauling system and the power used, the number of miners and other employés, the mine openings, and the miners' houses. No one of these various and essential elements can safely be said to be absolutely controlling, though likely the most important of them all are the real working places, the available points at which coal can be profitably mined. At each true working place a certain quantity of coal, to be determined by the thickness of the seam and conditions peculiar to the different coal fields, can be excavated and removed during stated periods of time; and so it follows that, if other essentials are adequate, the daily output of a mine can be computed by the number of its available working places. If the working places in a mine can provide a larger quantity of coal than the mine cars can haul, or the tipples can load, or the machines used and the miners employed can remove, then at that mine, during the time that such conditions exist, the daily output should be gauged by a careful investigation of the elements so tending to restrict its production. But even in instances of this character it is essential that a comprehensive study of the true status of the mine be made; otherwise unjust discrimination will ensue, with the inevitable result of irreparable injury to the mine so treated. If, for instance, it should appear during the inspection that the tipple had suffered an injury, or had been entirely destroyed, the presumption would be that it would be repaired or replaced immediately, and for the purpose of car distribution the mine should be rated as if the tipple were intact, though during the temporary disability its quota of cars would neither be needed nor furnished. Again, if the inspection should disclose the fact that the working places would produce and the tipples could load more coal than the mine cars could haul, still, if the number of such cars were sufficient to move the coal required to load the limited number of railroad cars assigned such mine, then the capacity of the mine for output should be ascertained from the number and character of the working places—there being no other deficiency than mine cars—for no mine should be required to keep on hand a greater number of mine cars than are necessary to move the coal required to utilize the tonnage allotted to it, for the supply of mine cars can be without delay increased should such tonnage be enlarged. Indeed, the entire supply of mine cars might either be disabled or destroyed, and still the mine itself, in all other respects, remain in perfect condition—a temporary suspension of shipping capacity existing, but its real al-

lotment for transportation purposes remaining the same. If the tipple capacity of the mine is found to exceed the maximum power of its working places, it would certainly be improper to rate that mine by such capacity, even if its mine cars and switch facilities relatively worked with its tipple. And if the mine car supply were in excess of the requirements of its working places, or of the ability of its tipple, or of its allotment of railroad cars, it would be an injustice to other mines, where such conditions did not exist, if such excess of mine cars were calculated to their limit in the rating for distribution of railroad cars.

When mines have been working for some time, not to the limit of their capacity, but on an output based on a restricted allotment of railroad cars, and a new inspection is taken from which to make the distribution of railroad cars for future use because of changed conditions, then such previous facts and the results naturally following therefrom should be noted with discernment before the maximum capacity of such mine for future output is announced. If this is not done, the mine is apt to be discriminated against, even though such was not intended, and mines where such conditions did not exist will, under the new allotment, develop themselves much faster than the mine which had theretofore been restricted in its output. If the railroad management withholds cars from a mine, it thereby, to a certain extent, retards its development, while, on the other hand, if such management discriminates in favor of a mine by allowing it more cars than its proper rating entitles it to, the result is the rapid and abnormal development of that mine, to the prejudice of those competing with it. It is therefore evident that, if equitable rules are not observed, the power that controls the railroad car supply can foster one mine at the expense of another, or can build up one locality while it is tearing down another. Hence it is greatly to be desired that this power of control should not be dominated by an interest in the output and profits of any of the mines subject to its jurisdiction, for, as has been most expressively said, "if self the wavering balance shake, it's rarely right adjusted."

The capacity of a coal mine for rating purposes is the amount of coal it is able to place in the railroad cars in a given time, and that depends on its working places, the thickness of its coal seams, its switches, workmen, mine cars, and tipples, its general equipment, and its management. The output of a mine is the amount of coal it in fact places in the railroad cars for shipment, and that is regulated by the number of such cars it is able to secure, provided its general equipment is efficient; and it may be and generally is less than its capacity, but can never exceed it. It is on account of these matters and those similar in character—of frequent occurrence in the mining regions—that no ironclad rule can be established with safety for the disposition of the questions we are now considering, and so it is that no separate element of a mine's capacity can be said to certainly control its output, which can in fact only be determined by the careful observation of impartial experts who have worthily and discriminatively studied and applied the conditions applicable thereto.

From these observations we deduce the rules that should govern

the situation confronting us in the present case, and when we properly apply them the judgment now to be entered suggests itself. As to the working places in the three mines mentioned, while there is some confusion concerning them, there is no real conflict, as the difference in the testimony regarding them is founded on the different views entertained by the witnesses as to what constitutes a working place; and hence, from their testimony, there is no real trouble in finding what we may well call the basic facts which are decisive of this controversy. From the testimony I find that at the time this suit was instituted the Kingwood Coal Company could fairly count and work at least 65 working places, the Irona Coal Company at least 103, and the Atlantic Coal & Coke Company at least 45. These working places, those available for mining purposes, were liable to such changes as were occasioned by abandonment, by accident, by development, and by the utilization of pillar spaces; but for all practical purposes necessary to their equitable rating said mines contained the places mentioned respectively, and they have changed in fact but little since then in number, though it seems that the pressure caused by litigation has made it possible to present them in a different light. That each mine possessed all of the equipment required to handle all of the coal that could be mined from such working places is plainly shown, and, that being so, it follows that the distribution of the railroad cars should have been on a basis that would have allotted to the Kingwood Coal Company 31 per cent., to the Irona Coal Company 48 per cent., and to the Atlantic Coal & Coke Company 21 per cent. of the cars allowed the West Virginia Northern Railroad by the Baltimore & Ohio Railroad Company. And yet at the period mentioned the railroad management made virtually the following apportionment of its cars: To the Kingwood Coal Company 18 per cent., to the Irona Coal Company 56 per cent., and to the Atlantic Coal & Coke Company 26 per cent. This allotment was not in accord with the actual conditions then existing at those mines, and, as I see the facts, it arbitrarily increased the numbers of cars that the Irona Coal Company should have received from 48 to 56 per cent., and the number the Atlantic Coal & Coke Company was entitled to from 21 to 26 per cent., while it unjustly reduced the number due the Kingwood Coal Company from 31 to 18 per cent. The ratings of the different mines made by the experts sent for that purpose after this controversy arose—one of which was adopted by the officials of the West Virginia Northern Railroad Company—were, to say the least, arbitrary and unreliable, and they were founded upon mistaken data; for instance, 48 working places for the Kingwood Coal Company, instead of 65— a misconception of the situation that, under the circumstances then existing, should not have been made. The rating in force at the mines mentioned on the day the relator filed its petition in this case was based upon a total daily capacity of 2,250 tons of coal, of which, as has been shown, 400 were allowed to the Kingwood Coal Company, 1,250 to the Irona Coal Company, and 600 to the Atlantic Coal & Coke Company; and this in the face of the undisputed testimony, admitted by the experts and conceded by the general manager of the West Virginia Northern Railroad Company, that the King-

125 F.—17

wood Coal Company had then more working places than had the Atlantic Coal & Coke Company. And when we recall the fact that all of the mines had all of the mining paraphernalia requisite for the excavating and loading of more coal than could be transported in the railroad cars allotted to them respectively, the injustice of that rating is not only indubitable, but amazing.

The petition for the writ of mandamus prays that the relator, the Kingwood Coal Company, be decreed to be entitled to 33⅓ per cent. of the total car supply furnished by the West Virginia Northern Railroad Company to the coal mines located along its line. The alternative writ was based upon that allegation and prayer, and it may be amended, if desired by the relator, so as to conform to the facts as the court has found them to be, after which the peremptory writ may issue requiring the defendant the West Virginia Northern Railroad Company to cease giving preference and advantage to the Irona Coal Company and to the Atlantic Coal & Coke Company over the Kingwood Coal Company in the shipping and transportation of coal, and to furnish to said Kingwood Coal Company without discrimination, and upon conditions as favorable as those given to other shippers, the full supply of cars due it under existing conditions, amounting in tonnage thereof to at least 31 per cent. of the present distribution.