UNITED STATES ex rel. PITCAIRN COAL CO. v. BALTIMORE & O. R. CO. et al.

BALTIMORE & O. R. CO. et al. v. UNITED STATES ex rel. PITCAIRN COAL CO. et al.

(Circuit Court of Appeals, Fourth Circuit. September 17, 1908.)

Nos. 772, 773.

1. CARRIERS (§ 32*)—INTERSTATE COMMERCE—DISCRIMINATION—DISTRIBUTION OF CARS.

Interstate Commerce Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3155), which prohibits discriminations, and section 1 as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 892), which requires carriers to furnish transportation on reasonable request therefor, make it the duty of an interstate carrier to furnish equal facilities for transportation, as well as equal rates, to all shippers who are similarly situated; and it cannot evade such duty in the distribution of cars by claiming that it is not the owner of a portion of the cars carried over its lines.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*

Duties and liabilities of carriers as to furnishing facilities for transportation, see note to Harp v. Choctaw, O. & G. R. Co., 61 C. C. A. 414.]

2. CARRIERS (§ 32*)—PRIVATE CARS—"UNDUE PREFERENCE."

In the distribution of cars by an interstate railroad company between coal mining companies on its line, when the supply is insufficient to meet all demands, a mining company which owns cars individually is entitled to have such cars assigned to its use; but it is not entitled in addition to a pro rata share of the cars owned by the railroad company, and such a distribution, if made, resulting in giving to such company larger facilities for transporting its product than are given to other companies similarly situated, but which own no private cars, constitutes the giving of an undue preference or advantage to such company, in violation of the interstate commerce law.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*

For other definitions, see Words and Phrases, vol. 8, p. 7172.]

3. CARRIERS (§ 32*)—DISCRIMINATION—DISTRIBUTION OF CARS.

An interstate carrier, in the distribution of cars, cannot give a shipper a preference in order that it may profit thereby, or that the shipper may profit thereby; and when called upon by a shipper for full car service the only defense which the carrier can interpose, in case of failure to comply with the demand, is that the supply which it has furnished is sufficient for normal demands, or that in case of shortage it has fairly and impartially prorated all of its car equipment.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

4. CARRIERS (§ 32*)—FUEL CARS—FOREIGN CARS.

In the distribution of cars by an interstate railroad company between the operators of coal mines on its line, its own fuel cars, the fuel cars of other roads sent upon its line to be loaded, its regular equipment of cars, and the private or individual cars of any mine operator should be placed absolutely on the same basis as together forming the available car equipment of the road as a whole; and where its own fuel cars or those of other roads are consigned to a particular mine, or the operator's own private cars are delivered to it, they should be charged against such mine, and it should be allotted only so many of the system cars as are necessary to make up its pro rata share of the whole.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

165 F.—8

5. CARRIERS (§ 32*)—DISTRIBUTION BETWEEN COAL MINE OPERATORS.
    A rule of a railroad company under which any coal mine operator on its line using its terminal tracks at the seacoast and there unloading its cars within five days on an average during any month is given as a premium a 50 per cent. larger allotment of cars during the next month is an attempted evasion of the provisions of the interstate commerce act, requiring a fair and impartial distribution of cars between shippers, and gives an undue preference or advantage to shippers so favored, in violation of such act.
    [Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

6. CARRIERS (§ 32*)—RATING OF MINES.
    In the distribution of cars by a railroad company between operators of coal mines on its line in times of shortage, the percentage of cars to which each mine is entitled should be determined solely by the physical capacity of the mine to furnish coal for shipment; and a rule of distribution by which such capacity is taken as one, while the amount of shipments for the preceding two years is taken as two, the sum of the rated capacity and such shipments being divided by three to determine the basis of distribution, is unfair and inequitable to new mines, and results in giving an undue preference or advantage to old mines, in violation of the interstate commerce law.
    [Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

7. CARRIERS (§ 32*)—MAIN AND COLLATERAL BRANCH LINES.
    Under Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 892), which requires railroad companies to furnish cars to shippers on collateral branch lines "without discrimination in favor of or against any such shipper," shippers on the main line of a road and those on a collateral branch line are entitled to precisely the same treatment in the distribution of cars.
    [Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

8. WORDS AND PHRASES—"TRANSPORTATION."
    The word "transportation," as used in Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 892), amending Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3155), includes all kinds of instrumentalities of shipment and carriage.
    [Ed. Note.—For other definitions, see Words and Phrases, vol. 8, p. 7075.]

    McDowell, District Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Maryland, at Baltimore.

Hugh L. Bond, Jr., John G. Wilson, and Edgar H. Gans (Charles Markell, Jr., on the brief), for plaintiff in error in No. 772 and defendants in error in No. 773.

Wm. A. Glasgow, Jr., and Frederick Dallam, for defendants in error in No. 772 and plaintiff in error in No. 773.

Before PRITCHARD, Circuit Judge, and McDOWELL and DAYTON, District Judges.

PRITCHARD, Circuit Judge. These are writs of error from the judgment of the Circuit Court for the District of Maryland, by both the petitioner and defendants. The following statement substantially contains the facts as to the matters in controversy between the parties:

A petition for mandamus was filed in the Circuit Court to require

the Baltimore & Ohio Railroad Company to cease from subjecting the relator and coal companies on the Monongah Division to undue and unreasonable discrimination in the shipping and transportation of coal. This petition was filed January 16, 1907, by the relator, the Pitcairn Coal Company, a corporation of West Virginia, against the Baltimore & Ohio Railroad Company and the Cumberland & Pennsylvania Railroad Company and 37 coal companies, most of them operating mines in West Virginia in what is known as the "Fairmont region." Of the defendants, the Fairmont Coal Company, the Clarksburg Fuel Company, the Pittsburg & Fairmont Fuel Company, the Southern Coal & Transportation Company, the Consolidation Coal Company, and the Somerset Coal Company are allied companies, practically all controlled by the Consolidation Coal Company, which also owns substantially all the capital stock of the Cumberland & Pennsylvania Railroad Company. The majority of the stock of the Consolidation Coal Company, until May, 1906, was owned by the Baltimore & Ohio Railroad Company, and was then sold by the Baltimore & Ohio Railroad Company to Clarence W. Watson, acting for himself and his associates: the railroad company retaining a lien for a portion of the purchase money. The allied companies are referred to as the "Fairmont Coal Companies," and the other coal companies operating in the Fairmont region of West Virginia are spoken of collectively as the "Independent Companies." The Baltimore & Ohio Railroad Company fully answered the petition, denying all allegations of undue preference or discrimination, and the Fairmont Companies fully answered, denying any discrimination in their favor. Thirteen other defendants answered, asking the same relief as prayed for by the relator, and others of the defendants who were summoned did not intervene in any way. At the hearing a jury was waived, and it was agreed by a stipulation in writing that the issues of facts should be tried and determined by the court without the intervention of a jury.

The Pitcairn Coal Company, the relator, owns a tract of about 1,000 acres of coal land near Clarksburg, W. Va., and has been operating a mine there since 1903, in what is known as the "Monongah district," on the West Virginia & Pittsburg Railway, which railway belongs to and is operated by the Baltimore & Ohio Railroad Company as a part of its railroad system. The Pitcairn mine has an eight-foot vein of good bituminous steam and gas coal, with working places for 208 miners, is well equipped with electric cutting machines, and is rated by the railroad company as having a possible physical capacity of mining 1,000 tons per day. The relator invoked the action of the court under section 23 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 387), as follows:

"Sec. 23. That the Circuit and District Courts of the United States shall have jurisdiction upon the relation of any person or persons, firm or corporation, alleging such violation by a common carrier of any of the provisions of the act to which this is a supplement and all acts amendatory thereof as prevents the relator from having interstate traffic moved by said common carrier at the same rates as are charged, or upon terms or conditions as favorable as those given by said common carrier for like traffic under similar conditions to any other shipper, to issue a writ or writs of mandamus against said common carrier, commanding such common carrier to move and transport the

traffic, or to furnish cars or other facilities for transportation for the party applying for the writ: Provided, that if any question of fact as to the proper compensation to the common carrier for the service to be enforced by the writ is raised by the pleadings, the writ of peremptory mandamus may issue, notwithstanding such question of fact is undetermined, upon such terms as to security, payment of money into the court, or otherwise, as the court may think proper, pending the determination of the question of fact: Provided, that the remedy hereby given by writ of mandamus shall be cumulative, and shall not be held to exclude or interfere with other remedies provided by this act or the act to which it is a supplement."

The provisions of the act of which the relator complains as being violated by the railroad company in favor of the Fairmont Coal Companies are set forth in section 3 (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), as follows:

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

The complaint of the relator is thus formulated in its petition:

"(7) Relator shows that the capacity of its mine at Clarksburg, West Virginia, aforesaid, is one thousand (1,000) tons of coal per day, and that if cars are received by it to load the same that it can and would load as much as one thousand (1,000) tons per day for shipment over the said Baltimore & Ohio Railroad, but it has never been able to get the cars sufficient to ship that amount of coal, and it has been unable to ship sufficient coal to fill contracts which it has and has had on hand, and has been unable to take certain valuable contracts for the delivery of coal which were offered to it, because of its inability to get a sufficient supply of cars from the Baltimore & Ohio Railroad Company in which to ship the same.

"Relator further shows that it has frequently made within the last three months and prior thereto, reasonable requests for cars to fill its contracts and to enable it to take valuable contracts which were offered, but the Baltimore & Ohio Company refused, declined, or failed to furnish to it such cars and other vehicles, instrumentalities, and facilities for shipping coal as were needed by relator in order to fill its contracts, or to ship the coal which was required by it under its obligations to persons to whom it had sold coal, and to enable it to take the valuable contracts aforesaid.

"Relator further charges that the Baltimore & Ohio Railroad Company has declined to give to relator the cars for carrying coal from its mines to which it was justly and properly entitled, as hereinafter particularly set forth; and, further, that the Baltimore & Ohio Railroad Company, as hereinafter more particularly set forth, has given an undue and unreasonable preference or advantage to other persons, companies, firms, and corporations, as hereinafter more specifically set forth, in its distribution and assignment of cars for service and shipments from the coal mines and coal operations along its line of road; and, further, the Baltimore & Ohio Railroad Company, as hereinafter more specifically set forth, has subjected relator and the other independent coal operators, defendants to this petition, to undue and unreasonable prej-

udice or disadvantage in its system of car distribution, and in service to the coal mines owned and operated by relator and such independent coal companies.

"(8) Relator further says that when the supply of cars is sufficient on the Baltimore & Ohio Railroad Company that all orders for cars are filled, but that this condition of affairs rarely exists, except for a few months of the year in the summer time; but, whenever in any district the supply of cars is insufficient to fill all orders, cars are supposed to be distributed, and the Baltimore & Ohio Railroad Company alleges that it has distributed such cars, on a percentage basis, to all of the mines in such district, but in the distribution of cars on a percentage basis, before distribution is made, certain arbitrary assignments of cars are made, reducing the total number of cars to be distributed, on the percentage basis aforesaid, as follows:

"First. All cars placed at the mines for the fuel or supply coal of the Baltimore & Ohio Railroad Company are not charged against the percentage to which the mines furnishing such coal are entitled.

"Second. New mines are allotted an arbitrary number of cars, daily or weekly, for development.

"Third. When foreign railroad companies—that is, companies other than the Baltimore & Ohio Railroad Company—send their own cars for fuel or supply coal to mines on the Baltimore & Ohio Railroad, such cars are treated as arbitrary, and are not charged against the percentage of the mines to which they are sent.

"Fourth. Cars owned by individual companies or operators, and commonly known as 'individual cars,' are placed at mines of the owners for shipment of their coal, and are not charged against the percentage of such mines.

"Fifth. Whenever a shipper on the Baltimore & Ohio Railroad ships cars to Curtis Bay, a tidewater terminal of the Baltimore & Ohio Railroad, and such cars are handled promptly in any one month, such shipper is allowed in the succeeding month a premium of fifty (50) per cent. of the number of cars so shipped, in addition to his regular percentage.

"Sixth. At certain points which are noted on the sheets of the Baltimore & Ohio Railroad Company, showing a distribution of cars on a percentage basis, an arbitrary number of cars is assigned to mines on fire.

"Seventh. Certain mines in the immediate vicinity of industrial plants are given an arbitrary allotment of cars which are empty and intended for loading at such industrial plants, if the cars, when loaded with coal, are to be consigned to such industrial plants.

"Eighth. When annual contracts are placed for foreign railroad fuel or supply coal with mines on the line of the Baltimore & Ohio Railroad, and cars are furnished by such foreign road for shipment of such fuel or supply coal, then the Baltimore & Ohio Railroad Company allots to the mine shipping such coal an arbitrary allotment of cars out of its equipment equal to the foreign cars furnished for such fuel or supply coal.

"After the foregoing arbitrary cars are allotted and assigned to the mines on the Baltimore & Ohio Railroad, the remaining cars, it is claimed by the Baltimore & Ohio Railroad Company, are divided among all the mines or operators, including those enjoying the arbitrary allotment of cars aforesaid, on the percentage basis.

"The above is the system of distributing cars as claimed by the Baltimore & Ohio Railroad Company, on the Monongah Division of said road, as above set forth, and relator charges that all such exceptions, limitations, and rules are made to the undue advantage of and in preference to certain coal companies and shippers, as herein set forth, in the prosperity of which the Baltimore & Ohio Railroad Company is interested. The Baltimore & Ohio Railroad Company claims to distribute cars on the several divisions of its road to coal mines on a capacity basis; that is, the capacity of the mine is supposed to have been arrived at by taking into consideration: (1) Physical capacity of the mine. (2) Previous shipments therefrom. And from this capacity a percentage is worked out for each mine of the cars for distribution on that division, in comparison with the capacity of the other mines on said division, and the assignment of cars to each division is worked out by arriving at the per-

centage of the equipment to which such division is entitled in comparison with the capacity for shipping coal to all the mines on the other divisions of said road."

Of the foregoing enumerated grounds of complaint there were three which were not urged at the hearing below, to wit, the second, sixth, and seventh. It was contended in the court below by the relator, Pitcairn Coal Company, that all of the cars available for use at the mines in the Monongah Division of the Baltimore & Ohio Railroad in West Virginia should be divided upon the percentage basis established in that district, and that the elimination of cars set forth under 1, 2, 3, and 4 above from the available cars for distribution, before applying the percentage division, gave the companies using such arbitrarily allotted cars an undue preference in having tonnage moved by the carrier, and subjected the relator and those companies not enjoying the use of such arbitrary cars to an unreasonable and unjust advantage.

The court below held that the railroad company, in allotting what are known as "individual cars" to the companies or coal operators owning the same, or to mines designated by such owners, without charging such cars against the number to which the mines using the same are entitled under the percentage system, was guilty of undue preference to such mines, and subjected the relator and the companies not receiving such individual cars to undue and unreasonable disadvantage, and that, while such cars ought to be allotted to the service of the company or coal operator owning the same, they should be charged against the number of cars which such owner or coal operator was entitled to under the percentage system in effect in the Monongah district. As to all the other cars, under paragraphs 1, 2, and 3, the court held that the arbitrary allotment of these cars was not an undue or unreasonable disadvantage to the company not receiving such cars. And the court ordered that a mandamus issue requiring the Baltimore & Ohio Railroad Company to charge all of the "individual cars" against the percentage of cars of the mines using the same, and overruling the complaint of the relator as to all other matters set up in its petition. From this order, as to "individual cars," the Baltimore & Ohio Railroad Company, the Fairmont Coal Company, and others, defendants, sued out a writ of error; and from the order refusing to grant the relief prayed for in the petition as to the other cars set forth, the relator sued out a writ of error.

We will first consider the assignments of error relied upon by the defendants, the Baltimore & Ohio Railroad Company and the Fairmont Coal Company and others. The learned judge who tried the case below made the following finding of fact which is taken as a basis of appeal on the part of these defendants:

"I find from the evidence in this case that, in times of coal car shortage, the giving by the Baltimore & Ohio Railroad Company to the mine operators in the Monongah district who own individual cars their own cars and in addition thereto their full percentage of the available general coal car equipment of the Baltimore & Ohio Railroad Company results in subjecting the relator, and the defendants asking with it the same relief, to undue and unreasonable prejudice and disadvantage, and that the said individual cars should be counted against the percentage distribution of the mine operators entitled to their exclusive use, respectively."

The record shows that many of the coal companies operating in the Fairmont region and controlled by the Fairmont Company owned individual cars. The evidence further shows that since 1852 coal companies have been the owners of individual cars, and that those cars have never been considered or taken into account by the railroad company making a pro rata division of the coal car equipment when the supply of coal cars was not sufficient to meet the demands of all the mine operators. The learned judge who tried this case below, in referring to this phase of the question, makes the following admirable statement as to the facts upon which he based his judgment as respects the individual cars heretofore mentioned:

"It is not contended in this case that the equipment of coal cars provided by the Baltimore & Ohio Railroad is not reasonably sufficient for their coal trade on the yearly average of the seasons. It is not in this proceeding claimed to be reasonable that of cars available solely for the transportation of coal, the demand for which is not constant during the year, the railroad should furnish sufficient for the maximum demand. Their equipment of coal cars has been recently largely added to, and is now, for about seven-twelfths of the year, ample to supply the demand of the mine operators. But during the remaining five-twelfths of the year, embracing the winter months, the demand for coal cars is on most days greater than can be furnished. Then it is that a percentage of the whole number available is allotted to each mine. The business of mining, transporting, and selling of bituminous coal is peculiar. The mine operator, as a rule, has no means whatever of storing the coal. It must be dumped from the mine cars directly into the railroad cars, and taken by the purchaser at its destination in those cars directly to the place where it is to be consumed, or to the vessels in which it is to be further transported by water carriage. This makes the railroad cars the place of storage for the coal from the mouth of the mine to the premises of the consumer or to the ship's side, if it is to be water-borne, or until a purchaser be found if the consignee has not a purchaser ready when the car arrives at the point of destination, and, as there is no place of storage at the mine, the cars must be supplied daily to receive the coal as mined. The difficulties resulting from the irregularity of the demand for coal between winter and summer, the difficulties resulting from it being a commodity which usually cannot be stored, and the fact that many of the large consumers require the coal dealer to contract to deliver them a daily and never-failing supply, has induced certain mine operators, having large capital, to increase their equipment of individual cars, and this has been availed of by the Fairmont Company to a very large extent, so that the Fairmont Company and its allied companies have now running regularly on the Baltimore & Ohio Railroad some 5,500 individual cars, many of them of 50 tons capacity. These allied companies have also, for the purpose of increasing the sales of the output of their mines and providing constant use for their individual cars, acquired large terminals on western lake ports and terminal facilities at seaboard ports in New England, and vessels and barges to carry coal between Curtis Bay and New England, and this has introduced their coal into new markets and greatly increased their business.

"The complaint of the relator is, not that the railroad company permits the exclusive use by their owners of the individual cars, but that by the system of car distribution, when there is a shortage, as practiced by the railroad company, there is produced an undue and unreasonable preference in favor of the owners of individual cars, and the relator and others in like situation are subjected to undue and unreasonable prejudice and disadvantage. By a method of calculation, which will be mentioned later, each mine in the district is given by the railroad officials a fixed percentage, based on its capacity to ship coal, and which is intended to be its proportion of the whole output of all the mines in the district. When the available car supply for the day is less than the demand, the mine is entitled to get that percentage pro rata of the whole available supply of coal cars belonging to the railroad company.

"The complaint of the relator is that from the whole available supply of

cars in the district on which the percentage is calculated there is first deducted and given to each mine its own individual cars, and then, besides, it also gets its full percentage allotment of the remaining Baltimore & Ohio Railroad cars, and that this system produces results which are very prejudicial to the mine having no individual cars, and which are made evident in many ways: First, that the railroad's tracks, engines, and operating force are taxed by handling so great a number of individual cars, so that the car supply comes to the mine late in time and irregularly and uncertain in numbers, with the result that the independent mines are constantly idle, and the force of miners, who are paid by the ton and who cannot work for want of railroad cars to receive the coal, become discouraged and leave; also, as the percentage of the mine is rated in large part by its actual output, its development and consequent percentage rating is kept from increasing, and the whole enterprise is held in check; also that, on account of the limited and uncertain and varying car supply, it is not reasonably possible for the independent operators to enter into any contracts to ship coal during the winter months when the demand is greatest and the prices highest. In the month of November, 1906, which was a month of average winter car supply, and in which the relator could reasonably have loaded 20 cars a day, and needed 20 cars a day to keep its miners and other employés from losing time, and had notified the railroad that it required at least 20 cars a day, making in all over 600 for the month, it received only 183 cars, and these were received very irregularly, viz.: On 4 days none, on many days only 1 or 2 or 3, making 18 days on which less than 10 were received. During the month there were a few nonpercentage days, usually Mondays, when the car supply was adequate, and on these days the relator's mine received and loaded very nearly its full capacity.

"It would not be reasonable to hold that the exclusive use of individual cars by the mine operators under a system which has grown up during half a century, and under which the trade has enormously developed, and upon the faith of which mine operators have invested millions of capital, often at times when the railroad company had neither money nor credit with which to increase its equipment, is now to be denied, unless it could be done upon fair terms mutually acceptable to the mine operators and the railroad. The use of individual cars is not peculiar to the Baltimore & Ohio Railroad, but has been quite generally used from the beginning of the coal trade in the United States and in England. While it is true that, if the railroad was so disposed, it might, by not keeping up its coal car equipment, gradually force all mine operators to provide individual coal cars, which would in the end leave in the business only those operators who were able to obtain and profitably use the large capital required to purchase individual cars, it does not appear that the railroad has pursued that policy. On the contrary, in 1905 it ordered 5,000 new coal cars of large capacity, increasing the total coal car equipment to about 45,000, and also increasing its engine equipment, so that it is abundant. Under the present system of individual ownership of coal cars it is not unreasonable that the owner shall have the exclusive use of the individual cars; on the contrary, it is only just. But under the actual circumstances of the business of the coal trade on the Baltimore & Ohio Railroad, from which it is apparent that the great struggle of the mine operators is to get sufficient cars to ship their product during the winter months, and that their business existence depends upon it, it is not unreasonable to hold that the railroad shall do all that it is practicable to do to avoid subjecting the operators who do not have the use of individual cars to unreasonable disadvantage. While it is true that the existence in the trade of a large number of individual cars does increase the total car equipment, and so far as the individual cars satisfy the requirements of the owners does increase the number of free equipment cars which the railroad has at its disposal, it still is a fact that in times of car shortage the demand is so great that all the mines having individual cars require and get their full percentage of the railroad's equipment, without reference to their own cars."

The interstate commerce act, in pursuance of which this suit was instituted, was passed on the 4th day of February, 1887, and was intend-

ed, among other things, to secure an equal and fair distribution of car facilities to all shippers similarly situated. It is sought by this proceeding to secure the enforcement of the provisions contained in section 3 of the interstate commerce act and section 1 of the act as amended June 29, 1906, 34 Stat. 584, c. 3591 [U. S. Comp. St. Supp. 1907, p. 892]). The amendment to the latter section is as follows:

"It shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon a reasonable request therefor."

By reference to the body of this section it will be seen that the word "such" refers to the previous sentence of the act, which, among other things, provides that:

"The term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation and transfer in transit, storage and handling of property transported."

It was evidently the intention of Congress, in the employment of the term "transportation," to include all kinds of instrumentalities of shipment and carriage, and the one explicit requirement of the entire section is that there shall be just and reasonable charges in connection with the "transportation of persons or property as aforesaid," and that cars shall be furnished "irrespective of ownership or of any contract, express or implied, for the use thereof."

Section 3 of the act provides that:

"It shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

As was said by this court in the case of United States ex rel. Greenbrier Coal & Coke Co. v. Norfolk & Western Ry. Co. et al., 143 Fed. 268, 74 C. C. A. 406:

"The purpose of this act is to place 'all shippers on an absolute equality.' The sections in question were intended to prevent discrimination in all branches of freight traffic."

While section 3 is comprehensive in its scope, it did not afford the means by which the provisions of the act could be carried into effect. Therefore Congress passed a supplemental act on the 2d day of March, 1889 (25 Stat. 862, c. 382), section 10 of which is now section 23 of the interstate commerce act hereinbefore quoted. Section 1, as amended, and section 3, confer certain rights upon shippers, and it is clearly provided, among other things, that there shall be no discrimination against or in favor of those similarly situated by the common carrier in furnishing means of transportation. Section 1 makes it the duty of the railroad to provide and furnish such transportation upon a reasonable request therefor, and section 3 is intended to secure to the shipper the same treatment with reference to facilities for transportation. Section 3 provides that all shippers shall have a just equality

of facilities, and section 1 provides that all shippers shall be given a just and equal sufficiency of facilities. This is a wise provision, and was intended to prevent common carriers from either directly or indirectly giving certain shippers an undue preference in the distribution of car service. In the absence of such legislation providing the means by which summary relief could be afforded the shipper, it would be an easy matter for the common carrier, by favoritism, to build up one class of shippers and at the same time utterly destroy the business of another class similarly situated, and it was to prevent this kind of discrimination that this act and the acts amendatory and supplemental thereto were passed.

The purpose of the provisions of the interstate commerce act relating to this controversy is to prevent the railroad from giving any undue or unreasonable preference or advantage to any mine owner in any respect whatever. Section 1 of the act, as we have stated, makes it the plain duty of the railroad to furnish transportation upon reasonable request. This duty is imposed upon the railroad, and it was clearly the intent of the framers of the act that the railroad should, upon reasonable request for the same, furnish vehicles for transportation. This duty in no sense of the word rests upon the shipper, but relates solely to the carrier. In this instance, as is the case in the enactment of almost every statute, there must have been strong reasons for the passage of this act. It is obvious, from even a casual reading of the statute, that at the time of its enactment certain shippers were unable to operate their mines so as to develop them, owing to the lack of car service, due to the unequal distribution of cars among those who were engaged in operating coal mines, and it was to correct this inequality that legislation of this character was deemed to be advisable and expedient. While the interstate commerce act is intended to regulate rates as well as facilities, there is no question of a rate involved in this proceeding. We are called upon to deal with facilities, and therefore it is not necessary to discuss the question as to the intent and meaning of the statute in so far as it relates to the regulation of rates.

In passing upon the questions involved, it should be borne in mind that the statute casts upon the carrier the plain duty of furnishing a fair and equal distribution of facilities to the shipper. The duty thus enjoined cannot be evaded by the carrier by claiming that it is not the owner of a portion of the cars carried over its lines. The duty of furnishing equal facilities relates to and involves purely the question of transportation, and when we are called upon to determine as to whether in any particular instance there has been an undue and unreasonable discrimination or preference as contemplated by the statute, the sole question is as to whether the entire equipment operated over the lines of the carrier has been fairly and equally distributed among all the shippers along its lines who are similarly situated. The defendant mine owners insist that in the purchase of individual cars they have expended a considerable sum of money, which thereby becomes a part of their investment and should be treated as such, and that it would be unfair to them to require the carrier to charge such cars as a part of the percentage to which they are entitled. This is a matter which we cannot consider, inasmuch as the statute was not

enacted for the purpose of promoting the interests of any particular mine owner; it being limited to one purpose, to wit, the fair and equal distribution of car service by railroads or transportation companies among all mine owners similarly situated within the territory in which their lines are operated.

It is made the duty of the carrier to move the product of the shipper, and in doing so, if the carrier should by any means deny to a particular shipper his just and proportionate share of facilities as compared with other shippers similarly situated, then, in that event, the shipper would undoubtedly be entitled to the relief afforded by section 23 of the act. If, as in this instance, a carrier, by contractual arrangement, operates individual cars belonging to mine owners as a part of its equipment, such arrangement cannot in the slightest degree relieve the carrier of the duty to furnish equal facilities to all shippers similarly situated. To adopt any other rule would be to make it possible for wealthy mine owners, by the purchase of car equipment to utilize the means of transportation operated by the carrier to such an extent as to practically deprive other mine owners similarly situated of any means of transportation, and it was to avoid this very kind of discrimination that the provisions of sections 1 and 3 of the interstate commerce act were enacted. There is nothing in the interstate commerce act which prohibits a carrier from making any arrangement it may choose as respects the ownership of cars which it operates on its lines. That is a matter which is left entirely with the carrier; but, while such is the case, it is equally true that the carrier cannot, by any such arrangement, by indirection, accomplish that which is prohibited by the statute.

We do not think it was the purpose of the framers of the act to undertake to secure the same development of each mine, but rather to place the various shippers upon an equal footing in so far as shipping facilities were concerned. To any one who is acquainted with the coal business it will be readily seen that, under any system of car distribution which places a particular mine owner in a position where such owner is unable to make prompt delivery of the product of his mine, such failure on the part of the shipper to receive his proportionate share of cars must necessarily result in placing him at a great disadvantage and in a position where it would be practically impossible to operate his mine, and all this to the very great injury of the consumer, who, under such conditions, is from necessity compelled to purchase from the favored shipper, at higher prices, or, at least, with suppressed competition, because the favored shipper can alone, under such conditions, guarantee and secure to him steady and uniform shipments of fuel absolutely necessary, in most cases, for the successful conduct of his business.

While the evidence in this case shows that in the year 1905 the railroad ordered 5,000 new coal cars of large capacity, increasing its total car equipment to 45,000 and its engine equipment to such an extent that in so far as its capacity for transporting freight is concerned, its equipment is sufficiently adequate to meet the requirements arising from the operations in that region, nevertheless it does appear that certain operators in that section, named as defendants in this proceed-

ing, are the owners of individual cars to a large extent, and that, in addition to receiving the percentage to which they were entitled upon the basis adopted by the railroad company in that territory, such owners are given an undue preference in the distribution of car service. In other words, the individual cars were arbitrarily assigned to the owners, and in addition thereto they were given their pro rata share of the cars belonging to the railroad company.

It appears from the statement of the learned judge who tried the case (hereinbefore quoted) that in the month of November, 1906, the relator could have loaded 20 cars a day, and actually needed that number of cars a day to keep its miners and other employés from losing time. It also appears that the railroad company was notified by the relator that it needed such number of cars per day, making in all over 600 for the month. It further appears that only 183 cars were received during the month, and those at irregular intervals, to wit: On four days none, on many days only 1, 2, or 3, making 18 days on which less than 10 were received. It further appears that during the month there were a few nonpercentage days when the car supply was adequate, and that on those days the relator's mine received and loaded very near its full capacity. This is clearly a discrimination under the statute, which entitles the relator to the remedy afforded by section 23.

In view of the opinion which we entertain as to the proper construction of this statute, it is not necessary to pass upon the contractual relations existing between the railroad company and the mine operators as respects individual cars. It appears that some of these cars have been paid for by the railroad company by the working out of the mileage contracts under which they were placed on the road, and are therefore the property of the company. The exclusive use of other cars now belonging to the Baltimore & Ohio Railroad Company is claimed by virtue of an agreement made with the Monongahela River Railroad Company, the former owner.

The defendants below contend that this question was decided in the case of Fairmont Coal Company v. Baltimore & Ohio Railroad Company, instituted March 12, 1903, in the United States Circuit Court for the Northern District of West Virginia, in equity, in which a hearing was had on a bill, and adjudged that the Fairmont Coal Company was entitled to the exclusive use of its individual cars, in addition to its proper pro rata share of all other cars of the railroad company's general equipment and car supply. That was a proceeding solely between the Fairmont Coal Company and the railroad company, in which no other shippers of coal were parties or had any opportunity to be heard. Therefore there is nothing in that proceeding to conclude the rights of the relator in the case at bar.

The other case relied upon by the defendants is Riverdale Mining Company v. Baltimore & Ohio Railroad Company, instituted in the United States Circuit Court for the Southern District of Ohio, in 1906, which was a suit for damages, claiming that the Baltimore & Ohio Railroad had discriminated in favor of the Fairmont Coal Company against the Riverdale Mining Company, the plaintiff in that case, in the distribution of coal cars, in violation of the interstate commerce act. In that case the court instructed the jury that the individual cars

belonging to the Fairmont Coal Company were not to be taken into consideration in estimating the cars to which complainant was entitled in the distribution among the mines of the Monongah Division. There the relator was not a party. While we entertain the greatest respect for the rulings of the learned judges who heard these cases, we do not think that, in a case like the one at bar, in which all the parties in interest have been afforded an opportunity to fully present their contentions the rulings in those cases are controlling in the case at bar.

That the proof in this case shows a preference in favor of the Fairmont Coal Companies and a resulting prejudice to relator growing out of such preference to the Fairmont Companies, does not appear to be seriously controverted. When it is shown, as in this instance, that the carrier has not supplied the facilities demanded, the burden is upon the defendant, in order to exonerate itself from such charge of undue preference, to show that it is prorating its cars fairly and equally among all the operators who are similarly situated and · engaged in transporting freight over its lines.

It is insisted that the Fairmont Company has large contracts, and therefore it must have a preference in cars by which it might keep its contracts. This contention is untenable. If this condition of affairs could be pleaded in justification of a discrimination in favor of a particular mine owner on the part of the carrier, then the provisions of sections 1 and 3 of the act would be without force, and those mine owners who were favored by the carrier with an unlimited supply of car service would be in a position to go upon the market and solicit business with little or no competition, thereby rendering it impossible for the weaker companies to successfully compete in the open market with their more favored competitors.

It was earnestly insisted by counsel for defendants below that in a case like the one at bar the rule that surrounding circumstances and conditions were to be taken into account in determining whether there had been an undue and unreasonable preference in the meaning of section 3 should control, and that the circumstances and conditions shown in this case are such as to justify the defendant in making the preference in question. That the surrounding circumstances and conditions are to be considered in determining whether there has been an undue and unreasonable preference in favor of another particular shipper is undoubtedly true; but in determining that question it necessarily follows that we should consider the circumstances and conditions surrounding the shipper, and not those that may happen to surround the carrier. If this were a case where we were called upon to deal with the question of rates as between rival lines, we would have to consider the peculiar conditions and circumstances surrounding the carrier; but that question is not involved in this proceeding.

We have carefully considered the cases cited by defendants in support of the contention that the court should consider the conditions and circumstances surrounding the carrier, and are of opinion that they do not apply to this controversy. In none of these cases does it appear that the question of competition among shippers was involved, nor does it appear that the circumstances relied upon to constitute a

preference were similar to those relied upon in this case. At common law the carrier is required to furnish to all shippers, regardless of the question of profit to itself, like facilities without any discrimination, and any contract which does not comply with these principles is void as against public policy. A carrier cannot give a shipper a preference in order that it might profit thereby; neither can it give the shipper a preference in order that the shipper may profit thereby, and, when called upon by the individual shipper for full car service, the only defense which the carrier can interpose in case of failure to comply with the request of the shipper is that the supply which it has furnished is sufficient for normal demands, and that in times of stress it has fairly and impartially prorated all of its car equipment. If it should appear in any such case that any particular shipper was given preference in excess in his pro rata share of its cars, then such preference would necessarily be an "undue preference" at common law. That portion of the interstate commerce act which relates to undue preference is declaratory of the common law, and, when considered in connection therewith, we are forced to the conclusion that any undue preference which is based upon the theory that the preference is made with a view of promoting the interests either of a shipper or a carrier, without due regard to the interests of shippers who are similarly situated, is violative of the sections under which this suit was instituted.

We have carefully considered the evidence bearing on the questions raised by the assignments of error of the Baltimore & Ohio Railroad Company and the Fairmont Company, and are of opinion, for the reasons herein stated, that the findings of fact by the court below are fully justified by the evidence, and that the rulings of the court as respects the questions involved therein, under the circumstances, were eminently proper.

Having disposed of the questions involved in the defendants' writ of error, we will now consider those matters assigned as error by the relator.

The court below, in dealing with the question relative to the fuel cars of the Baltimore & Ohio Railroad Company and foreign railroad cars, held that they were not to be charged against the companies using them as a part of the percentage to which they were entitled under the arrangement agreed upon to which reference has heretofore been made. A careful consideration of this phase of the question forces us to the conclusion that the fuel cars of the carrier, its regular equipment of cars, the cars of other roads sent in for fuel, and the private or individual cars of the mining operators should be placed absolutely upon the same basis in so far as the distribution of car service by the carrier is concerned. We fail to understand upon what theory the carrier can relieve itself from a charge of discrimination, when it is shown that such cars are arbitrarily allotted to certain mines, and not charged to such mines as a part of the percentage to which they are entitled under the arrangement by which it is undertaken to secure a fair distribution of car service among shippers on its line. This question has been passed upon by the Interstate Commerce Commission in the case of Railroad Commissioner of Ohio et

cl. v. Hocking Valley Railway Company (No. 1,008) 12 Interst. Com. Rep. 398, in which, among other things, it is said:

"Defendants are engaged principally in the transportation of coal from mines located upon their lines. Certain other railways purchase their fuel supply from coal operators owning mines upon the lines of defendants and send their own cars upon the lines of defendants, consigned to the coal companies with which railways so sending their cars have contracts for fuel supply. Certain other coal operators have upon the lines of one of the defendants leased or so-called 'private' cars, devoted exclusively to the use of such lessees. During a part of the year defendants are unable to furnish all of the cars desired by coal operators along their lines, and at such times the available cars not specially consigned or restricted as to use are divided among the several coal companies according to the capacities of their several mines. But in such distribution the foreign railway fuel cars and the leased or 'private' cars are excluded from consideration, and are given to the coal companies to which they are consigned or assigned in addition to the full share of cars alloted to such mines in the proportionate distribution. Complaint alleges unjust discrimination against other coal operators along the lines of defendants, in that such distribution of cars and such failure to count the foreign railway fuel cars and the leased or 'private' cars gives the coal operators to whom such cars are consigned and assigned unwarranted advantage over other operators in the mining and marketing of coal. Held, that a carrier should give to owner or lessee of private cars the use of such cars, and should also give to a coal company the foreign railway fuel cars consigned to it, but that such 'private' and foreign railway fuel cars should, in the distribution of cars, be counted against the company to which delivered, and such company should not be given, in addition to such delivery, a share of the system cars, except when the number of 'private' and foreign railway fuel cars so delivered to it is less than its distributive share of the available cars, including system cars, foreign railway fuel cars, and so-called 'private cars,' in which event it should be given only so many of the system cars as are necessary, when added to the number of private and foreign railway fuel cars assigned to it, to make up its distributive share of the total available cars, including system cars, foreign railway fuel cars, and so-called 'private' cars."

In the case of Logan Coal Co. v. Pennsylvania R. Co. (C. C.) 154 Fed. 497, Judge Holland, in an opinion handed down July 1, 1907, among other things, says:

"What has been said in regard to individual cars applies to the use of fuel cars, whether they be those of the defendant company or fuel cars of other corporations purchasing coal from the relator. They should be treated the same as individual cars in the distribution of available cars, and the defendant company, in its treatment of these cars by the order of January 1, 1906, in no way that we can see unduly or unreasonably discriminated against the relator. This precise question has not heretofore been considered, but the question of car distribution to shippers, including individual and fuel cars, has been before the courts in a number of cases, and the general trend of the decisions is to the effect that all cars, whether individual cars or owned by the railroad company, or assigned by other railroad companies for fuel, shall be treated as an available car equipment as a whole, distributable pro rata to shippers desiring their use along the line, upon a basis giving each equal facilities with the other."

It is manifest that it was the purpose of Congress to prevent railroad companies from resorting to such means in order to evade the requirements of the act, to wit, a fair and equal distribution of facilities among shippers similarly situated. In determining as to whether there has been an undue and unreasonable preference in any particular instance, the sole question to be considered is as to whether all the cars hauled over the carrier's lines have been prorated so as to give

each and every shipper on its lines his proportionate share of facilities to which he is entitled on the basis agreed upon as the means by which there should be a fair and equal distribution of such car service. Therefore, when we consider the statute, the provisions of which are plain and unmistakable, we are impelled to the conclusion that the arbitrary allotment of the fuel cars of the company and foreign fuel cars is violative of the provisions of the act. Section 1, among other things, provides that:

"Cars shall be furnished irrespective of ownership or any contract, express or implied, for the use thereof."

This makes it the duty of the company to furnish cars, regardless of ownership or of any contract, express or implied. Therefore the question as to the ownership of the cars or the purposes for which they are used can have no bearing in this controversy. In other words, in a proceeding instituted pursuant to section 23 of the act, it would not be a good defense for the railroad company to insist that it was using a portion of its cars for the purpose of transporting fuel, and was therefore unable to give the relator its pro rata share of cars upon the basis agreed upon.

Relator insists that the court below erred in its ruling in relation to what is known as the "Curtis Bay premium." The defendant says that to encourage a prompt discharge and return of coal cars, and also the use of its own tracks at Curtis Bay, the terminal of the railroad, at Baltimore, it put in force a rule by which all shippers or consignors who during the month average not more than five days' detention of the cars assigned to them were granted a premium of 50 per cent. additional to their car supply for the next month. It is also insisted that this opportunity is open to all shippers who consign coal to Baltimore for water transportation. It is insisted by the relator that, if the road desires to bring about a quick unloading and return of cars, it should do so by a penalty in the nature of demurrage for delay and that to attempt to secure promptness by offering a premium is in violation of the spirit of the act. The method adopted by the railroad company in this respect seems to us to be still another means by which the carrier is enabled to evade the requirements of the act. By this system it is possible for certain favored companies to secure a large number of cars in excess of the amount to which they would be entitled under a fair and equal distribution of the same, while, on the other hand, the carrier could adopt a plan by which those who are not prompt in making deliveries at that point could be made to pay penalties by demurrage without affecting the car supply one way or the other, and thus, without inconvenience to the carrier, place all shippers on equality. That this system by which premiums are given to those who are prompt in making delivery at Curtis Bay can be used so as to give certain shippers an undue and unreasonable preference over those who are less fortunate is apparent, and we think constitutes a violation of the provisions of the act.

In determining the number of cars to which the various companies on the line of the Baltimore & Ohio Railroad Company are entitled, the percentages are based, first, on the capacity of the mine; second,

on the previous shipments, the capacity being allowed to count as one (1) and the shipments as two (2) in ascertaining the percentages. The capacity of each mines is ascertained by a personal inspection by the inspector of mines of the Baltimore & Ohio Railroad Company. The contention of the relator in regard to this method is as follows:

"We insist that this method of arriving at the percentage of car supply to which the several shippers are entitled is unjust and unfair, and discriminates against the Pitcairn Coal Company in favor of companies which have been engaged in mining coal for a longer period of time than it. For illustration of the way in which this system works as against a new mine, take a mine opened in 1905, with a physical capacity in January, 1907, when this action was brought, rated by the inspector of mines at 500 tons per day. The average daily shipments of the mine during the summer of 1906 were, say, 40 tons per day. The average daily shipments during the summer of 1905 were nothing. Under this system you add the physical capacity, 500 tons, to the average daily shipments for 1906, 40 tons, and then add the average shipments of 1905, nothing, which makes a total of 540 tons. This is divided by three, which gives the rating of the mine at 180 tons per day; and the percentage that this rating of 180 tons per day is of the total rating of the district in the same way is the percentage of cars to which such mine is entitled."

The court below, in passing upon this subject, said:

"I cannot find any unfairness in the method of rating complained of."

This method is comparatively new, having gone into effect in January, 1903. The witness, Mr. R. M. Hite, who, testified that he had been in the coal business all his life, and who is now engaged in mining at Kingmont, having operated that mine since 1891, bearing on this point, testified as follows:

"I don't think previous shipments are a proper element to take into consideration in arriving at the percentage of equipment to which a mine is entitled. There are many reasons why. In the first place, take a small acreage of coal, say 50 to 100, and a man opens a mine with 50,000 tonnage capacity, and they rate it on previous shipments, and they get to working it for a year, and that reduces the capacity, as the coal begins to run out and the working places will run off; and, when it comes to rating it on a capacity basis, they would reduce that amount on account of the number of working places being reduced. In the system of taking into consideration the previous shipments there would be a decided advantage in favor of an old mine, or a mine that was developed as against one that was beginning to be developed. Of course, the new mine has no shipments to commence with, and the natural effect in times of great demands for coal is to limit the supply, and they get a large supply from the old mines."

In discussing this question, Mr. Arthur Hale, general superintendent of transportation of the Baltimore & Ohio Railroad, says:

"Supposing we take a new mine, whose production is 5,000 tons the first year, and then come to rate that mine along with others, alongside of an older mine which has produced 20,000 two years before, and 20,000 the year immediately preceding the day of rating, the new mine only gets as its elements one year's shipments, because there have been none the second year. The older mine gets the two years' shipments. That operates against the newer mine. The whole effect of that is disadvantageous to the new mine. We take past shipments, and give that a valuation of twice the value of the actual physical power to get out coal, because the physical capacity usually exceeds the average output so much that, if you only take one year, it gives the capacity an undue prominence—it becomes of very much more importance than previous shipments."

165 F.—9

In the case of United States ex rel. Kingwood Coal Co. v. W. Va. No. R. R. Co. (C. C.) 125 Fed. 255, Judge Goff, in a very able and exhaustive opinion on this subject, in discussing the proper rule to be observed in working out the most desirable basis for securing a fair distribution of railroad cars to the mine owners, says:

"I am of the opinion that in reaching a proper basis for the distribution of railroad cars it is necessary that an impartial and intelligent study of the capacity of the different mines be made by competent and disinterested experts, whose duty is should be to carefully examine into the different elements that are essentially factors in the finding of the daily output of the respective mines which are to share in the allotment. Among the matters to be investigated are the following: The working places, the number of mine cars and their capacity, the switch and tipple efficiency, the number and character of the mining machines in use, the hauling system and the power used, the number of miners and other employés, the mine openings, and the miners' houses. No one of these various and essential elements can safely be said to be absolutely controlling, though likely the most important of them all are the real working places, the available points at which coal can be profitably mined. At each true working place a certain quantity of coal, to be determined by the thickness of the seam and conditions peculiar to the different coal fields, can be excavated and removed during stated periods of time; and so it follows that. if other essentials are adequate, the daily output of a mine can be computed by the number of its available working places."

Under the present method of ascertaining the percentage of cars to which the shipper is entitled, those shippers who are just beginning to develop their property are placed at a great disadvantage, and owing to which it is well-nigh impossible for a shipper thus situated to secure a sufficient allotment of cars as to enable him to dispose of the product of his mine in such quantities to secure anything like a substantial development of his property. Therefore we are of opinion that such system of coal mine rating is unfair and inequitable to new mines located along the line of this railroad company, where there are a number of old and established mines. To hold otherwise would be to give the Fairmont Coal Company and other favored companies an undue and unreasonable preference, which, as we have heretofore stated, is forbidden by the act, and we are therefore of opinion that the court below erred in ruling that this particular method was a fair and reasonable one. We think the true rule as to the basis for the distribution of cars is correctly stated by Judge Goff in the case of United States ex rel. Kingwood Coal Co. v. W. Va. No. R. R. Co., supra, and that, in determining the percentage of cars to which each mine is entitled, the railroad company should be guided solely by the physical capacity of the mine to furnish coal for shipment.

It is further insisted by the relator that the court below erred in its ruling in respect to the distribution of cars for the Cumberland & Pennsylvania Railroad. It contends that the allotment of coal cars by the Baltimore & Ohio Railroad from its equipment before they reached the Monongah Division of the West Virginia & Pittsburg Railroad, operated by the Baltimore & Ohio Railroad, to the Cumberland & Pennsylvania Railroad at its junction with the Baltimore & Ohio Railroad, at Cumberland, thus preventing such cars from coming to the Monongah Division, gives an undue advantage to the ship-pers on the Cumberland & Pennsylvania Railroad, to the prejudice

of the shippers on the Monongah Division, where there is a shortage of coal cars. The court below heard all the evidence bearing on this question, and after considering the same, among other things, said:

"The coal traffic on the Baltimore & Ohio Railroad began in 1843, and until 1855 was all from the Cumberland region, and from mines none of which were located on the Baltimore & Ohio Railroad, but were reached by lateral roads from the mines to the Baltimore & Ohio Railroad at Cumberland and Piedmont. Several of these lateral roads became incorporated in the Cumberland & Pennsylvania Railroad, which practically is a combination and extension of the lateral roads to which, for half a century, the Baltimore & Ohio Railroad has been supplying equipment, and by which the coal traffic, which is its most important business, was started, and has been built up. It cannot be maintained that fair treatment to the new coal mines of the Fairmont region, which are on the lines of the Baltimore & Ohio Railroad, requires that the old established mines on these lateral feeders shall be deprived of the equipment which for half a century has been furnished them, and was being furnished when the relator began operating its mine. The equipment furnished is based on the number of cars the Cumberland & Pittsburg Railroad has had in previous years, and there is no sufficient evidence to show that it is an unfair allotment and works an unjust discrimination against the relator."

The relator insists that the ruling of the court below, to the effect that the Cumberland & Pennsylvania Railroad Company is a lateral branch of the Baltimore & Ohio Railroad, is erroneous, and further insists that, even if the court below was correct in its ruling in this respect, it is not entitled to claim a supply of the Baltimore & Ohio cars under that portion of the first section of the interstate commerce act which relates to lateral or branch lines of railroads. The provision in question reads as follows:

"Any common carrier subject to the provisions of this act, upon application of any lateral branch line of railroad, or of any shipper tendering interstate traffic for transportation, shall construct, maintain and operate upon reasonable terms a switch connection with any such lateral branch line of railroad, or private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of the same; and shall furnish cars for the movement of such traffic to the best of its ability without discrimination in favor of or against any such shipper."

We have carefully considered this clause of the act, and are of opinion that it is intended thereby to provide that a shipper located on a branch or lateral line shall be furnished cars without discrimination either in favor of or against such shipper. To hold otherwise would be manifestly unjust to those shippers who do not happen to own mines along the main line of any particular road. It was undoubtedly the purpose of Congress in the enactment of this clause to secure for shippers located on branch or lateral lines the same kind of treatment that is accorded to those whose mines are located on the main line of the carrier, and, as we have heretofore said, we think the court's ruling to the effect that this is a branch or lateral line of the Baltimore & Ohio Railroad is proper, in view of the testimony bearing on that subject. However, when we come to consider the allotment of cars by the Baltimore & Ohio Railroad Company to the Cumberland & Pennsylvania Railroad Company, we are of opinion that such allotment should be made on the same basis by which the Baltimore & Ohio Railroad is required to allot cars to its own shippers. We do not understand upon

what theory the system now in vogue, by which cars are allotted to these branch or lateral lines of road, can be sustained. Therefore we think that the Baltimore & Ohio Railroad Company by the provisions of the interstate commerce act is required to furnish cars to the Cumberland & Pennsylvania Railroad for the use of shippers on said road, but in doing so, due regard should be had to the system by which the Baltimore & Ohio Railroad Company distributes its car service to the patrons along its lines. Having indicated our views as to the proper system which should be adopted by the railroad company in the distribution of cars among the shippers on its line, we do not deem it necessary in this connection to discuss the matter further than to say that the distribution of car service on this line should be in accordance with the views which we have already expressed on that subject.

It has been earnestly insisted by counsel for defendants that to require the railroad company to charge individual cars, as well as fuel and foreign cars, as a part of the percentage to which a particular shipper may be entitled, would be a great injustice to the mine owners. This may be true; but we are called upon to construe the law as we find it, and the court has no power to alter or change the law in that respect, and, so long as the law remains as it now is, we must place that construction upon it which will give full force and effect to the intent and purpose for which it was enacted.

For the reasons hereinbefore stated, the judgment of the Circuit Court, in so far as it relates to the questions raised by defendants' writ of error, is affirmed, and the judgment of the court on the questions raised by the relator's writ of error is reversed, in so far as it relates to fuel cars, foreign fuel cars, the method of arriving at the capacity of a mine for car distribution, and the fixing of the percentage of cars to which each mine is entitled, and the Curtis Bay premiums. The judgment of the court to the effect that the Cumberland & Pennsylvania Railroad is a branch or lateral line of the Baltimore & Ohio Railroad Company, and entitled to its proportionate share of cars, is affirmed; but the judgment of the court to the effect that the method of car distribution on said lateral or branch line is correct is reversed. The case will be remanded to the Circuit Court, with instructions to proceed in accordance with the views herein expressed.

Remanded.

McDOWELL, District Judge, dissents.